**Ex parte FABIANI.**

No. M-1494.

United States District Court
E. D. Pennsylvania.

May 26, 1952.

140

Edward A. Kallick, Philadelphia, Pa., for plaintiff.

Desmond J. McTighe, Norristown, Pa., for defendant.

McGRANERY, District Judge.

This matter arises on a petition for a writ of habeas corpus, and involves the power and scope of judicial review of a draft board classification.

Petitioner, now twenty-three years old, has desired to become a medical doctor since he was twelve years old. In his youth, as a high school student, he was known by the sobriquet "Dr. Kildaire." He matriculated at Villanova College, receiving the degree of Bachelor of Science in Biology in June, 1950. In addition to petitioner's receiving his degree with biology as his major area of study, he selected chemistry as his minor field. While in college, he belonged to the premedical fraternity. Beginning in the summer of 1949 and continuing into 1950, petitioner made vigorous efforts to secure an acceptance to an accredited medical school. Petitioner's quest moved in ever-widening circles. He had friends intervene on his behalf with the authorities at Jefferson Medical College and Temple University. He addressed applications to the medical schools of Georgetown University, University of Pittsburgh, University of Pennsylvania, and St. Louis University, as well as to Jefferson Medical College, Marquette University and Temple University. He also sought admittance to three Canadian medical schools, and to schools in England, Ireland, and Scotland. His long-continued efforts were uniformly unsuccessful.

There can be no question that petitioner's efforts to study medicine were totally unrelated to any covert desire on his part to avoid military service: at the time he initiated his efforts and for a year thereafter the Army was making no calls on Selective Service for draftees. In the newspaper phrase of the time, the draft was "in the deep freeze" in 1949. There it was to remain until the Korean outbreak in June, 1950. And petitioner's persistence in his project after the draft was again in operation is likewise no sign of any will

to avoid army service: doctors are a class particularly sought by Selective Service, and are subject to a special call. See, e. g., Presidential Proclamation No. 2906, 50 U.S.C.A.Appendix, § 454 note.

While engaged in his endeavor to obtain admission to a medical school, the petitioner, then still a college student, attended a lecture by a Dr. Max Strumia, sponsored by his premedical fraternity. Dr. Strumia mentioned that he himself had received his professional training in Bologna, Italy, and detailed encouraging instances of American students who had gone to Italy to study medicine, returning to the United States to practice. Heartened by this lecture, petitioner discussed his plight with the dean of Villanova. He received from the dean a promise of assistance in his efforts to become a student at the Medical School of the University of Rome, as well as recommendations as to suggested courses that would better qualify him for admission to that school. These suggestions the petitioner followed.

We may note that there is nothing surprising or inexplicable in petitioner's choice of a medical school: he is of Italian parentage and he speaks Italian, as do his parents and sister.

The petitioner had registered under the Selective Service Act of 1948, 62 Stat. 604, 50 U.S.C.A.Appendix, § 451 et seq., on September 15, 1948, and was classified I-A on December 20, 1948.

Petitioner inquired of the secretary of his draft board in July, 1950, as to the procedure for medical deferment. He had his only interview with a member of his draft board, Local Board 107 of Bryn Mawr, Pennsylvania, on or about October 18, 1950, when he spoke with the chairman, Dr. J. Allyn Rogers, a veterinarian.

The petitioner's account of this interview was contradicted in no substantial particular by the board chairman. Petitioner testified that he told the chairman that he had an acceptance to the Medical School of the University of Rome; that it was possible that he might go to Rome for his medical studies. The chairman thereupon advised against petitioner's go-

ing *"because that school was not recognized."* (Italics supplied.)· Told that the school was recognized, he replied, it is said, *"Well, still, when you come back, they will give you a very difficult time in passing your State Board examinations."* (Emphasis added.) Petitioner further stated that when he advised the chairman that his application was pending at Jefferson the chairman promised that once this information was confirmed in writing by Jefferson, he would receive a deferment pending final action on the application. Doctor Rogers admitted that he had said, "Something like that."

Petitioner left the United States for Italy on October 28, 1950, traveling by airplane. He registered as a medical student in the University of Rome on November 2, 1950, beginning classes the same day. The academic year in the school runs from November 1st to October 31st, with a summer recess intervening. Until coming back to the United States in January, 1952 at the direction of the United States Attorney for this District, petitioner remained there in residence, continuously engaged in the pursuit of those courses leading to graduation. · By letter· dated November 10, 1950, ;petitioner advised his local board of his arrival in Rome; this letter bears the stamp of the local board as of November 28, 1950. Petitioner also secured from the Italian Minister of Foreign Affairs a certificate testifying to his residence in Rome Medical School; the original was dated November 28, 1950, and has the stamp of the local draft board dated December 13, 1950. This certificate was in the Italian language.

Petitioner further forwarded to the board an original certificate from the University of Rome dated December 6, 1950, setting out the fact of his residence and study in that school. This document bears the stamp of· the local board as of December 13, 1950. Later, through his parents, he sent to the board a "Tessera" or identification slip of the School dated December 6, 1950, bearing his picture and testifying that petitioner was in the second year of medical school during the academic year 1950–1951. During the year 1951 he caused

to be delivered certificates from the school witnessing his pursuance of the third year of medical study. Originals of such certificates are attached to the official file copy of this· Opinion as Appendix "A".

Such were the. steps taken by the petitioner to advise his local draft board of his whereabouts and his academic activities. No reply or communication from the board was ever sent to the petitioner. On this point his uncontradicted testimony was:

"Q. Now, after you sent these certificates and these documents to the draft board did you receive any further communication from the draft board? A. I never did receive any communication from the draft board.

.. "Q. You never did receive any? A. Never."

The Government has stipulated that this was so.

The board mailed to petitioner under date of November 7, 1950 an Order to Report for Physical Examination. He was to appear on November 22, 1950; he did not do so. The chairman of the board, Dr. Rogers, when examined by petitioner in his capacity as custodian of the draft board records, testified to the existence in the board files of a letter from the petitioner to his mother, dated November 15, 1950, discussing his experiences in the Rome Medical School. The mother gave that letter· to the draft board at the same time that she returned to it the Order to Report for Physical Examination, and the board kept that letter. On this point Rogers stated:

"By the ·Court:·

"Q. But that [the letter of November 15th] shows that he was in Rome for the purpose of attending Rome ·University? ·A. That was addressed .to her, not to. me.

"Q. But it had· notice in· there that he ·was in the Rome Medical School? A. Yes, sir.".

The Chairman of the board asserted· that he perused and filed this letter before ·November 28, the date the board stamped petitioner's letter from Rome advising of his arrival there. But ·despite the earnest

urging of the Court, he could not fix the date more precisely than that; indeed, as the record appears, he may have considered it prior to November 22, 1950, the date on which petitioner failed to appear for examination. As we have seen, the local board had received petitioner's letter from Rome and a certificate from the Italian Ministry of Foreign Affairs by November 28th. It stamped a certificate from the University of Rome on December 13, 1950, and a "Tessera" or identification slip on December 27, 1950.

The local board made no use of all of this material, and assigned no weight to it. It simply sent an Order to Report for Induction to petitioner on January 8, 1951 and turned him over to the United States Attorney's office as a delinquent on February 1, 1951.

Dr. Rogers, the chairman, several times testified that he considered the case out of his hands on November 28, 1950; that the matter could not then be reopened. Yet petitioner's folder, which was sent to the State Headquarters "six or seven times" was *first* referred there on *January 16, 1951*. This was nearly two months after the chairman insists the matter was out of the hands of the local board. He further admitted that the record shows no correspondence whatever between the local board and the State Office with respect to the petitioner between November 7, 1950 and January 8, 1951, the date the Order of Induction was sent.

Rogers further conceded that once petitioner failed to report for his physical examination, "There was no important action taken after that time" by his board. At no time between the date of petitioner's failure to appear and his referral as a delinquent did the board as a board discuss petitioner's case, reopen it, or resolve to adhere to its former classification and so notify petitioner. Rogers cannot even show by a notation in a board memorandum or a personal recollection that he ever between the failure to appear and the receipt of petitioner's letter from Rome called the board's attention to petitioner's failure to appear. He claims only that "higher authority" advised proceeding with

an order for induction on January 8th, and that he had had oral discussions with a Mr. Price, his field supervisor, from time to time. Material submitted to the board by petitioner's counsel in October 1951 showing petitioner then to be a registered third-year medical student was forwarded to the State Office, and a request to reopen petitioner's classification was denied.

The United States Attorney wrote to petitioner in December, 1951 stating that he would be indicted unless he returned to the United States by February, 1952; he returned a month before that. He was ordered on February 1, 1952 to report for induction.

This Court on February 7, 1952 issued a rule to show cause why a writ of habeas corpus should not issue.

The petitioner obviously is contending that he should have been classified in Class II-S as a medical student (Selective Service Regulations Sec. 1622.25(2)). The University of Rome Medical School is accredited by the New York State Board of Medical Examiners, as shown by the communications annexed to the official file copy of this opinion as Appendix "B". There is testimony in the record that there are over 2,000 students attending this school, of whom over 300 are Americans. Indeed, the local board could have had no feeling against the professional competence of the School, since chairman Rogers himself testified.

"I know nothing of the status of the University medical school. It may be the finest in the world as far as I know."

Nor is it denied that at the time that petitioner enrolled in the University of Rome Medical School and began his studies there, there was no provision in the Selective Service Act or Regulations granting deferment as a medical student exclusively to men enrolled in American schools, although an operations bulletin achieving this result (except that Canadian Schools are not put under the ban) has since been issued.

Two further facts must be noted before the legal issues here involved are dis-

cussed: (1) petitioner, while abroad, was advised that there was some question as to his right to be there, and thereupon authorized the efforts made by his counsel to protect his interest; (2) the government, while not admitting for the purposes of the record that Rome Medical School is a recognized school, has stipulated that the petitioner was in fact a student there.

The government has moved to dismiss the petition for a writ of habeas corpus on the grounds that (1) the relator is not committed or detained by any process or mandate issued by any United States Court; (2) the relator is not in the custody, actual or constructive, of any United States Marshal or jailor of any penal institution under any authority issuing out of any United States Court; (3) the purpose of proceeding by writ of habeas corpus is an inquiry into the legality of the detention of the relator, and the only judicial relief authorized by the use of such writ is the discharge of the prisoner or his admission to bail; (4) irrespective of the form of relief sought, the petition should be dismissed since the petitioner has not exhausted all the remedies available to him under the Selective Service System.

We turn now from the facts to the law.

(a) Judicial Review of the Actions
of Local Boards

We are met at the outset of our consideration of the legal issues herein with the question whether this Court has the power, at this point in time, to review the action of the local board at all, or whether petitioner must first report for induction and then adopt one of two courses: (1) refuse to submit to induction and in the criminal prosecution for violation of the Act that would surely follow, defend on the ground that the board's action was without basis in fact or contrary to Selective Service Regulations; or (2) allow himself to be inducted and then sue for a writ of habeas corpus.

■ The Court is of the opinion that the petitioner is not driven to choose one of two such desparate alternatives; that it may intervene at this juncture to protect his rights. To that end, a writ of habeas corpus will issue and the local board and the United States Attorney's Office for this District will be stayed from taking any step looking toward the induction or indictment of this petitioner until this case is heard on appeal or disposed of by agreement between the parties or until further order of this Court.

■ The Court is also of the opinion, on the record made herein, and it so holds, that the local board herein has acted in an arbitrary and capricious manner, unlawfully, without any basis in fact, and contrary to the Selective Service Regulations. The Court so holds in the face of counsel for petitioner's expression of his belief that the local board acted in good faith.

The Universal Military Training and Service Act of 1951, 50 U.S.C.A.Appendix, § 460 (b) (3) provides:

"The *decisions of such local board shall be final,* except where an appeal is authorized and is taken in accordance with such rules and regulations as the President may prescribe." (Emphasis added.)

There was a provision identical in substance in the Selective Service Act of 1940, 54 Stat. 885, 893; 50 U.S.C.Appendix § 310 (a) (2). The question whether this section permitted judicial review of the actions of local boards and, if so, what was the scope of such review, was definitely considered and decided by the Supreme Court of the United States in Estep v. United States, 1946, 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567. The Court held that the Congress had not foreclosed judicial review of a draft classification, and that such review might be had in a criminal prosecution under the Act where the registrant had reported for induction, was finally accepted, but refused to submit to induction. The opinion of the Court is discussed and analyzed in a (1946) Note, "Selective Service and Judicial Review," 32 Virginia Law Review 618 and in recent decisions notes in (1946) 44 Michigan Law Review 874–6 and (1947) 31 Minnesota Law Review 286–8; see also, Russell, "Development of Conscientious Objector Recognition in the United States," 20 George Washington Law

Review 409 (March, 1952); Cornell, "Exemption from the Draft: A Study in Civil Liberties," 56 Yale Law Journal 258 (1947), Lindsley, "The Necessity for Exhausting Administrative Remedies—Its Consequence in Judicial Review of Selective Service Cases," 32 Georgetown Law Journal 385 (1944), and Comment (1947), 56 Yale Law Journal 403, "Restrictions on Judicial Review of Administrative Agencies Exercising Emergency Powers—Duty to Obey Orders Prior to Determination of Invalidity."

Cases dealing with judicial review of the decisions of military draft boards are collected at 129 A.L.R. 1186; 147 A.L.R. 1320; 148 A.L.R. 1389; 149 A.L.R. 1457; 150 A.L.R. 1422; 153 A.L.R. 1424; 154 A.L.R. 1449; 155 A.L.R. 1452; and 156 A.L.R. 1450.

The test as to the availability of judicial review was set forth by Mr. Justice Douglas in the Estep case, 327 U.S. at page 122, 66 S.Ct. at page 427:

"The provisions making the decisions of the local boards 'final' means to us that Congress chose not to give administrative action under this Act the customary scope of judicial review which obtains under other statutes. It means that the courts are not to weigh the evidence to determine whether the classification made by the local boards was justified. The decisions of the local boards made in conformity with the regulations are final even though they may be erroneous. *The question of jurisdiction of the local board is reached only if there is no basis in fact for the classification which it gave the registrant.*" (Italics ours.)

Referring to the fact that the lower courts had held that a registrant unlawfully inducted could obtain relief by habeas corpus, and holding for the Supreme Court that the remedy of habeas corpus could be invoked by an aggrieved registrant after conviction of violation of the Act, Justice Douglas went on to say, 327 U.S. at pages 124–125, 66 S.Ct. at page 428:

"But if we now hold that a registrant could not defend at his trial on the ground that the local board had no jurisdiction in the premises, it would seem that the way then be open to him to challenge the jurisdiction of the local board after conviction by *habeas corpus. The court would then be sending men to jail today when it was apparent that they would have to be released tomorrow.*

"* * * the fact that *habeas corpus* after conviction is available in these cases gives added support to our reading of § 11. [The section providing for "finality" of draft board decisions under 1940 Act] *It supports a rejection of a construction of the Act that requires the courts to march up the hill when it is apparent from the beginning that they will have to march down again.*" [Italics in passage ours.]

This Court feels that to remit the petitioner to the remedy of habeas corpus after induction or to defending a criminal prosecution by drawing in question therein the board's classification would be exactly that type of judicial circuity and waste motion which the Supreme Court in the Estep decision has counseled us to avoid. It is clear that no court before whom this case would ultimately come could sustain the action of the local board herein. No written regulation restricted medical deferments to students in American schools; the board chairman tells us that there was no list of approved medical schools at the time he refused to consider the claims of the Rome Medical School and that he merely "understood" that students had to confine themselves to American medical schools, though "it has never been set up." His arbitrary refusal to consider certificates and statements issued by a sovereign government and a recognized school as anything more than documents devoid of meaning and fit only for filing, would not commend itself to any court. It is this type of procedure, it would seem, that led to the issuance recently of Local Board Memorandum 37 cautioning the boards, because of the actions of a few transgressors, to avoid reliance upon oral data and to rest instead upon verified information in the record so as to decrease the incidence of unauthorized deferments

and unauthorized refusals to defer. On such a strong showing, this Court does not feel justified in compelling the registrant either to undergo the ignominy of a criminal prosecution, with the consequent possible destruction of his medical career, or to submit himself to induction amid the notoriety and humiliating and defamatory comment inevitably spewed forth in a situation of this kind.

The Supreme Court approved the doctrine of judicial review as developed in the Estep case in the later decision of Cox v. United States, 1947, 332 U.S. 442, 448–449, 68 S.Ct. 115, 92 L.Ed. 59.

Gibson v. United States, 1946, 329 U.S. 338, 67 S.Ct. 301, 91 L.Ed. 331, presents an interesting variation of the Estep theme, and shows that the Supreme Court is tending to broaden the remedies of the selective service registrant. The Court there noted that new procedural regulations had been promulgated by Selective Service in response to a mandate of statute, 57 Stat. 596, 599, 50 U.S.C.Appendix, § 304a, whereby a preinduction physical examination was given before issuance of the order to report for induction, rather than afterward, as had been the case previously. The Court ruled that, in view of the change in regulations a registrant accepted as physically fit was not required to go through the final step of reporting to the work camp for conscientious objectors as directed in order to have standing in a subsequent criminal prosecution to challenge the validity of the classification given by his draft board.

The Selective Service Act of 1948, 62 Stat. 604 and the Universal Military Training and Service Act of 1951, 50 U.S.C.A. Appendix, §§ 451–473, 65 Stat. 75, like the Act of 1940, 54 Stat. 885, 50 U.S.C.A.Appendix, § 301 et seq., are silent on the question of judicial review of draft board classifications. However, a perusal of the legislative history of these Acts shows express congressional approval of the doctrine of judicial review as it had been developed to that time by the United States Supreme Court. Thus the Senate Report to the 1948 Act reads in part, Senate Report No. 1268, United States Code Congressional Service 80th Congress, Second Session, 1948, Volume 2, p. 2008:

"Section 12. Penalties

"(a) Enforcement.—This subsection provides the same penalties for violations of the provisions of this legislation as were provided for violations of the 1940 act, and is substantially a reenactment of section 11 of that act. Certain changes of language have been made to incorporate judicial determinations made pursuant to the predecessor act. *No changes have been made in the nature of judicial review of selective-service classifications.* Instead, it is contemplated that the procedure and scope of review defined by the Supreme Court in enforcing the 1940 act will be equally applicable under this legislation.

"(See Falbo v. United States, 320 U.S. 549 [64 S.Ct. 346, 88 L.Ed. 305]; Estep v. United States, 327 U.S. 114, 122–123 [66 S.Ct. 423, 90 L.Ed. 567]; Cox v. United States, 332 U.S. 442, 448–449 [68 S.Ct. 115, 92 L.Ed. 59].)"

So judicial review of draft board actions has not been foreclosed by the Congress of the United States.

In addition to a desire to avoid that marching up the hill and down again condemned by the Supreme Court in Estep v. United States, 327 U.S. 114, 125, 66 S.Ct. 423, 90 L.Ed. 567, another strong consideration moves this Court to intervene to protect the rights of petitioner, even though he has not reported for a pre-induction physical examination or for induction. The consideration is the difference in purpose between the 1940 Act on the one hand and the 1948 and 1951 Acts on the other. The first was enacted when Europe was already at war; when Belgium, Holland, Norway, Denmark, and France had already been overrun by Nazi Germany, and Great Britain seemed about to be devoured in its maw. During by far the greater part of the operation of that Act, the United States itself was at war, locked in deadly embrace with predatory and militaristic powers. Draft quotas ran to 300,000 and 400,000 men *a month*. The keynote was urgency, speed, and a sense of immediate peril. This is

sharply revealed in the opinion of Mr. Justice Black for the Supreme Court in Falbo v. United States, 1944, 320 U.S. 549, 551, 64 S.Ct. 346, 347, 88 L.Ed. 305:

"When the Selective Service and Training Act was passed in September, 1940, *most of the world was at war.* The preamble of the Act declared it *'imperative to increase* and train the personnel of the armed forces of the United States.' *The danger of attack* by our present enemies, if not imminent, *was real,* as subsequent events have grimly demonstrated. *The Congress was faced with the urgent necessity of integrating all the nations's people* and forces for national defense. That *dire consequences* might flow *from apathy and delay* was well understood. Accordingly the Act *was passed to mobilize national manpower* with the *speed* which that necessity and understanding required." (Italics ours.)

As one commentator observed. (Connor, " 'Due Process' And the Selective Service System," 30 Va.L.Rev. 435 (1944)):

"the Selective Service System * * * is designed to accomplish an emergency objective *. * *. Because Selective Service has this emergency character, time is of the essence in all of its operations * * *. The decision in the Falbo case and the decision in the Billings case present, to repeat the words of Mr. Justice Murphy ' * * * another aspect of the perplexing problem of · reconciling basic principles of justice with military needs in wartime * * *.' " (pp. 436, 452.)

■ The purpose of the 1948 and 1951 Acts, to the contrary, is merely to achieve and maintain sufficient armed strength to deter aggression; it is not to prepare for war. It is to maintain a position of reasonable military strength over a period of tension that, as we have been cautioned by no less an authority than General George C. Marshall, former Chief of Staff and Secretary of Defense, may continue for a generation. Thus, in contrast to the "imperative" terminology in the preamble to the Act of 1940, we find in the introduction to the 1948 Act:

"The Congress hereby declares that an *adequate* armed strength must be *achieved and maintained* to insure the security of this Nation." 62 Stat. 605. (Emphasis added.)

The preamble to the Act of 1951 contains identical language. 50 U.S.C.A.Appendix, § 451. Furthermore, the Senate Report accompanying the 1948 Act states, Senate Report No. 1268, United States Code Congressional Service, 80th Congress, Second Session, 1948, Volume 2, p. 1989:

"the President recommended the prompt adoption of universal military training as essential in a long-term program of security, saying that the nation had found that a sound military system is necessary in time of peace *if we are to remain at peace.* Later in his message he recommended the temporary reenactment of selective service, pointing out that our armed forces lack the necessary men to maintain their authorized strength and that their *necessary strength cannot be maintained by voluntary enlistments.*" (Italics ours.)

Similarly, the House Report to the Universal Military Training and Service Act of 1951 asserted, House Report No. 271, United States Code Congressional and Administrative Service, 82d Congress, First Session, 1951, Volume 2, p. 1472:

"The purpose of the proposed legislation is to accomplish two highly important objectives:

"1. It will enable the armed services to immediately raise and maintain an armed force of sufficient size, as determined by the Joint Chiefs of Staff, to meet our *minimum security requirements;* and

"2. It will establish a universal military training program." (Emphasis ours.)

The different objective to be achieved by the new Act behooves us to employ a more liberal standard of judicial review, so as better to protect the rights of the individual. Should—which God forbid—world

tensions increase greatly or should general war come, then the judicial arm can once again cut to the barest minimum its supervision of the operations of the draft.

We think that the different objective of the 1948 and 1951 Acts has been recognized by numerous Courts, and that they are consequently more willing to scrutinize the actions of the local boards (cf. Horowitz, "Rights of a Registrant under the Selective Service Law," 7 Intramural Law Review of New York University 106 (January, 1952)). Thus, in Tomlinson v. Hershey, D.C.Ed.Pa.1949, 95 F.Supp. 72, Judge Ganey of this Court refused to dismiss a complaint for an injunction and a declaratory judgment brought by a registrant against the authorities of Selective Service, even though he had not reported for induction as ordered. The registrant subsequently abandoned his own suit; it is apparent the board had proceeded quite properly. After the abandonment, the registrant was indicted and convicted for violation of the Act—see, United States v. Tomlinson, D.C., 94 F.Supp. 854.

In Ex parte Barrial, D.C.S.D.Cal.S.D. 1951, 101 F.Supp. 348, the Court held that the petitioner had been inducted into the Marine Corps pursuant to an invalid order of the local board, issued a writ of *habeas corpus,* and directed his release. The board had adopted a resolution that any registrant married after July 7, 1950 would not be considered for deferment except in extreme hardship cases, even though the Selective Service Regulations then provided that a registrant who had a wife with whom he maintained a bona fide family relationship in their home should be placed in Class III-A.

Again, in United States v. Everngam, D.C.S.D.W.Va.1951, 102 F.Supp. 128, the Court acquitted a registrant charged with violating the 1948 Act in that, after his acceptance for service, he refused to be inducted. He defended on the ground that he had been denied classification as a conscientious objector solely because he was a Catholic, in violation of the statute and regulations and that he had thereby been denied due process of law.

In Cox v. Wedemeyer, 9 Cir., 1951, 192 F.2d 920, a case arising under the 1940 Act, the Court of Appeals reversed an order dismissing a petition for a writ of habeas corpus, holding that the relief prayed should have been granted. Petitioner had urged that he had not waived his claim to classification as a conscientious objector merely because, in his letter of appeal, he had requested deferment as a minister of the gospel without adducing the alternative ground. The Court held that the board of appeal was required to classify the registrant *de novo* on the basis of his whole Selective Service record, and that he had been improperly inducted.

More recently, the Court of Appeals for this Circuit, in Application of Abramson, 196 F.2d 261, held illegal the impressment into the United States Army of a Selective Service registrant who, between the posting and delivery of an incorrectly addressed induction order, made an appropriate showing entitling him to reclassification in a deferred class. The Court reversed a dismissal of the petition, holding that it stated a basis for relief. The cause was remanded for further proceedings.

In United States v. Romano, D.C.S.D. N.Y.1952, 103 F.Supp. 597, Irving R. Kaufman, D. J., the defendant was held not guilty on an indictment under 50 U.S.C.A. Appendix, § 462 for failing to take one step forward for induction into the United States Army. The Court found a denial of due process in the local board's failure to grant the registrant a requested hearing after he had been classified. In United States v. Strebel, D.C.D.Kan.1952, 103 F.Supp. 628, Mellott, C. J., the Court granted defendant's motion for judgment of acquittal, on the ground that the Selective Service Regulations had not been fully observed. No new "Notice of Classification" had been sent to the registrant after the local board had adhered to its original classification of eligibility for military service despite a personal appearance on his part. The old classification had been allowed "to drift along."

Recent cases where the action of the local board was sustained upon ample evi-

dence are Ex parte Albertson, D.C.D.C. 1951, 103 F.Supp. 617, Kirkland, D. J., and Imboden v. United States, 6 Cir., 1952, 194 F.2d 508.

### (b) Procedure

At the second hearing had on this matter, Dr. Rogers, the chairman of the board, testifying as a government witness, stated that the petitioner had never "specifically" requested that his classification be reopened and had never appealed to the State or National Directors of Selective Service or to the President. Reference was also made in the case to Selective Service permits to leave the United States, although Dr. Rogers somewhat puzzlingly testified that 'they [the board] could not" give petitioner such a permit. Neither of these factors impresses this Court as of substantial importance.

■ The fact that petitioner never "specifically" requested the reopening of his case is unimportant. The steady stream of communications from overseas, coupled with the visit of petitioner's mother and the activities of his counsel, certainly amounted in effect to a continuing request by petitioner that his case be reopened. Of course, Regulation Sec. 1624.1(b) (CCH Emergency Labor Law: Wage and Manpower Controls, Par. 59,656, p. 69,221) provides: "That no registrant may be represented before the local board by anyone acting as attorney or legal counsel." But that Regulation, it appears to the Court, envisages the usual situation where the registrant himself is in the United States and fit and available to speak for himself. And the mistake, if mistake it was, was cured by the sending of papers and documents directly · by the petitioner himself. In addition, that same Regulation authorizes the board "in its discretion, [to] permit any person to appear before it with or on behalf of a registrant." And the board made an appointment with petitioner's counsel, at which he arrived belatedly.

Petitioner's failure to take an appeal is similarly without significance. He had been classified I–A in December, 1948, and his time to appeal from that classification expired ten day thereafter. Selective Service Regulations Sec. 1626.2(c). The local board's steadfast refusal to reopen his classification or to send him a new notice of classification adhering to its original decision effectively deprived him of any right to appeal thereafter.

Reference to the regulation dealing with permits to leave the United States (Sec. 1621.16 CCH Emergency Labor Law: Wage and Manpower Controls, Par. 59,-541, p. 69,165) does not aid the Government's case. That section does not forbid any registrant without such a permit to leave the United States: it is permissive rather than mandatory. Moreover, the regulation instructs that the permit "should issue * * * unless it is found that the registrant's absence is likely to interfere with the performance of his obligations * * *." So had it been applied for, it should properly have been granted.

### (c) Form of Relief

The Court is of the opinion that the petitioner is presently in constructive custody of the Government by reason of the United States Attorney's direction to him to return to the United States by February 15 or be indicted. He is not free to go where he pleases; in a sense, he is enjoying jail liberties. This type of detention was held sufficient to support the issuance of a writ of habeas corpus in Chin Yow v. United States, 208 U.S. 8, 28 S.Ct. 201, 52 L.Ed. 369, where a Chinese claiming to be an American citizen had been refused permission to come into the United States at San Francisco, and had been turned over to the General Manager of the Pacific Mail Steamship Company. A writ of habeas corpus will issue. Nevertheless, since the interest of this Court is to see substantial justice done in this case, and since, in the well-remembered rhetorical image of Professor Maitland, the forms of action, though dead, must not rule us from their graves, an injunction also will issue against the United States Attorney's office and the local board to protect the rights of the petitioner pending (1) appeal or (2) a composition between the petitioner and the board or (3) further order of this Court.

Submit decree in accordance herewith.