## UNITED STATES v. HAGAMAN.
### No. 11189.

United States Court of Appeals,
Third Circuit.

Argued Feb. 2, 1954.

Reargued·March 19, 1954.

Decided May 13, 1954.

Rehearing Denied June 4, 1954.

Motion to Amend Denied Aug. 13, 1954.

Hayden C. Covington, Brooklyn, N. Y., for appellant.

Stephen A. Teller, Asst. U. S. Atty., Wilkes Barre, Pa. (J. Julius Levy, U. S. Atty., Scranton, Pa., Roger A. Woltjen, Asst. U. S. Atty., Milford, Pa., on the brief), for appellee.

Before BIGGS, Chief Judge, and MARIS, GOODRICH, McLAUGHLIN, KALODNER, STALEY and HASTIE, Circuit Judges.

HASTIE, Circuit Judge.

This is an appeal from a conviction for failing and refusing to be inducted into the armed forces of the United States after being ordered to do so.[1] There is no doubt that the appellant, Hagaman, refused to be inducted into the armed forces. The defense to the criminal prosecution is that he was not obliged to obey the order to report and be inducted because the order was predicated upon Selective Service classification so improper that a court, acting within judicial province as defined in Estep v. United States, 1946, 327 U.S. 114, 66 S. Ct. 423, 90 L.Ed. 567, should declare it invalid.

Hagaman makes three distinct contentions: first, that the local board failed to follow prescribed procedure; second, that his claim to deferment as a minister of religion was rejected arbitrarily; and third, that the National Appeal Board had no basis for action it took changing his 1–O classification to 1–A.

All of us agree that the first and second contentions are without merit. The reasons for that conclusion appear in the opinion of Judge Goodrich. However, it is the decision of the court that appellant's third contention is sound and, therefore, that the conviction cannot be sustained.

This is the reasoning on the decisive third point which seems sound to a ma-

1. "[A]ny person who * * * evades or refuses registration or service in the armed forces * * * shall, upon conviction in any district court of the United States of competent jurisdiction, be pun-ished by imprisonment for not more than five years or a fine of not more than $10,-000, or by both such fine and imprisonment * * *." 50 U.S.C.A.Appendix, § 462(a).

jority of the court. The registrant claiming to be both a minister of religion and a conscientious objector, appealed to his district board from his local board's order placing him in class 1–A. On that appeal, in accordance with established procedure, the file was referred to the Department of Justice for advisory opinion. Honorable Curtis Bok, sitting as hearing officer for the Eastern District of Pennsylvania, then heard the registrant and filed his report and recommendation expressing his strong and complete conviction that the young man was sincere and was entitled at least to a conscientious objector classification. The Department of Justice so recommended and the five member district board by unanimous vote so decided, classifying the registrant 1–O.

Thereafter, the registrant, still believing that he was entitled to the additional exemption of a minister, caused the Director of Selective Service to appeal the 1–O conscientious objector classification, thus placing the whole matter before the National Appeal Board for reconsideration. That board, by a two to one vote, without stating any reason, and apparently without any additional evidence, not only denied the ministerial classification but revoked the conscientious objector classification and placed the registrant in class 1–A.

Thus, the present attack upon registrant's classification does not raise the question whether the local board had any justification for the initial 1–A classification,—and we do not suggest that it did—but rather whether the national board had any allowable basis for replacing the 1–O classification put into effect by the district board with its own 1–A classification. This distinction is important because the national board, very much like the court in this proceeding, seems merely to have reviewed the record made below, while the district board had made its 1–O classification on the basis of new matter, a report

of a de novo hearing before an examiner and the resulting recommendation of the Department of Justice,[2] in addition to the local board file.

Upon what did the national board predicate its decision? We can look at the record and see what the considerations must have been for and against the claim of ministerial exemption. But the record does not disclose what it was that moved the national board to change the 1–O classification to 1–A. There certainly was very obvious basis in the record for the district board's action in classifying registrant as a conscientious objector. We are left to speculate why the national board refused to accept that showing.

The Court of Appeals for the Sixth Circuit disposed of a record very much like this one by saying merely that, since there was no evidence contradicting the registrant's claim or inconsistent with his actual classification as a conscientious objector, and the national board acted merely on the file without taking testimony, the reclassification from 1–O to 1–A "was arbitrary and capricious and without basis in fact." Jewell v. United States, 6 Cir., 1953, 208 F.2d 770, 771; cf. United States v. Alvies, D.C.N.D.Cal., 1953, 112 F.Supp. 618. Even more recently the Court of Appeals for the Fourth Circuit has disposed of such a record by saying "An examination of the file shows that there is nothing therein contradictory of the facts stated in the * * * [report and] recommendation [of the Department of Justice] and nothing upon which appellant could be denied his claim of exemption as a conscientious objector. The order giving him the classification 1–A, having no support in the record, is therefore void." Pine v. United States, 4 Cir., 212 F.2d 93. In a somewhat similar situation the Court of Appeals for the Second Circuit reversed a denial of habeas corpus and remanded the case to the district court to determine as a fact the basis upon which the conscien-

2. A regulation requires the Board to "consider" the report and recommendation of the Department of Justice. 32 C.F.R. § 1626.25(c).

tious objection claim had been rejected. United States ex rel. Reel v. Badt, 2 Cir., 1944, 141 F.2d 845.

■ In the case last cited the court indicated that such agencies as these boards should make their processes "sufficiently explicit to reveal, so far as may be reasonably practicable, whether or not they are keeping within the statute under which they purport to act". 141 F.2d at page 848. Of course such disclosure need not be technical or elaborate. And it is not necessary at all in the usual case where the issue in controversy and the basis of decision are made apparent by the record itself. But in cases like the one now before us, the reclassifying board should indicate in a general and non-technical way why it changed the classification.

However, we are reluctant to reverse on this procedural deficiency, if there is any satisfactory way of reaching the merits of the case. For that reason we have searched the record for possible bases of reclassification, though none has been made explicit or even inferentially clear. We find just two possibilities. The board may have thought that as a matter of law the showing made did not meet the statutory requirements for classification as a conscientious objector.[3] Or it may have disbelieved the registrant's testimony as to his convictions about participation in war.

■ We are inclined to believe that the national board proceeded on the first ground, taking the position that as a matter of law Jehovah's Witnesses are not conscientious objectors. This impression is based in large part upon the fact that in recent months Courts of Appeals have had to consider a whole series of rather similar cases where unexplained orders of the national board changing the classification of Jehovah's Witnesses from 1–O to 1–A make sense only if they represent a consistent administrative application of this under-

standable, if mistaken, legal theory. Pine v. United States, 4 Cir., 1954, supra; Jewell v. United States, 6 Cir., 1953, supra; United States v. Hartman, 2 Cir., 1954, 209 F.2d 366; cf. Taffs v. United States, 8 Cir., 1953, 208 F.2d 329, certiorari denied 1954, 347 U.S. 928, 74 S.Ct. 532. Indeed, the government urged this legal point in its brief on the present appeal. It was pointed out that the registrant as one of Jehovah's Witnesses predicates his opposition to war on the tenets of the Watchtower Bible and Tract Society. Admittedly, that religious organization disapproves international war but sanctions "theocratic war". Hence, it was contended that Jehovah's Witnesses are not taught opposition "to participation in war in any form." But on oral argument in this case that contention was abandoned in the light of impressive decisions against the government on the very point since Hagaman's conviction. Taffs v. United States, supra; United States v. Hartman, supra. Thus, it is now conceded that the national board was wrong if it reclassified the registrant on the theory that his professed creed would not sustain a claim of conscientious objection to war.

■ But what if, apart from this legal question, the national board did not believe the registrant was sincere in his professions? Was the national board entitled, on the paper record alone, thus to discredit and reject the registrant's proof which had been so convincing to the hearing officer and the district board? Jewell v. United States, supra, and Pine v. United States, supra, both strike down such action as arbitrary. But here the government argues that such disbelief of the registrant might properly have been based on the fact that this young man, one of whose parents was a Jehovah's Witness, had not himself embraced that faith until he was seventeen years old at a time just

3. Section 6(j) of the Universal Military Training and Service Act exempts from combatant training and service a registrant "who, by reason of religious train-ing and belief, is conscientiously opposed to participation in war in any form." 50 U.S.C.A.Appendix, § 456(j).

three months before he registered for Selective Service. However, such rejection of testimony would have reflected the antithesis of the normal and proper unwillingness of a reviewing agency, which has not heard a witness, to reverse a judgment as to his credibility. Beyond that, it is a striking example of the very type of refusal to credit the evidence on the basis of suspicion and speculation, no conflict appearing on the face of the record, which the Supreme Court disapproved very recently in Dickinson v. United States, 1953, 346 U.S. 389, 74 S.Ct. 152, 157. It does not matter whether we accept the statement of the majority in the Dickinson case, that " * * * the courts may properly insist that there be some proof that is incompatible with the registrant's proof of exemption", or the complaint of the dissenters, that "Under today's decision, it is not sufficient that the board disbelieve the registrant. The board must find and record affirmative evidence that he has misrepresented his case * * *." 346 U.S. at page 396, 399, 74 S.Ct. at page 159. Under either formulation we would have to assume that the national board here did just what the Supreme Court disapproved, and, different from the Dickinson case, in the face of the strong contrary conviction of the district board as well as the hearing officer before whom the registrant had appeared. In these circumstances the classification cannot stand on the possibility that the national board was unwilling to credit the registrant's testimony as to conscientious objection to participation in war.

▮ In United States ex rel. Reel v. Badt, supra, the Court of Appeals for the Second Circuit sent the case back to the district court for a further hearing because on the record it could only speculate whether the classification was made on a lawful or an unlawful basis. Here, we are satisfied that neither of the possible bases was proper. The 1-O classification was changed to 1-A either on a theory which the government now concedes to be legally wrong, or by an arbitrary decision on the facts. The reclassification was invalid and induction could not lawfully be required.

The judgment will be reversed.

GOODRICH, Circuit Judge (dissenting in part).

While this opinion is termed a dissent, the first two points discussed represent the opinion of all the members of the Court. They are: (1) Procedural due process; (2) The refusal to classify Hagaman as a minister of religion. The dissent by the minority comes upon the conscientious objector point discussed in Judge Hastie's opinion, which is joined in by enough of his colleagues to constitute a majority of the Court.

We turn to the procedural point first. Hagaman says he was denied procedural due process. After the filing of his questionnaire he received from his local Board a classification of 1-A. He requested a personal interview, to which he was entitled under the regulations.[1] He had a personal interview. The Board heard him fully. Then he was told orally that his classification would not be changed and that he could appeal.[2] He did appeal; in fact his appeal went to the highest administrative authority, the National Selective Service Appeal Board.

The basis for Hagaman's complaint is that the local Board did not formally "reclassify" him after the personal in-

1. *"Opportunity to appear in person.* (a) Every registrant, after his classification is determined by the local board * * * shall have an opportunity to appear in person before the member or members of the local board designated for the purpose if he files a written request therefor within 10 days after the local board has mailed a Notice of Classification (SSS Form No. 110) to him." 32 Code Fed.

Regs. § 1624.1 (1949). Substantially the same provision appears in the present regulation, 32 Code Fed.Regs. § 1624.1 (a) (1951).

2. The Board's minutes state: "Registrant told he would remain 1-A and case not reopened." On the same day as this hearing, the Board for the second time sent Hagaman a Notice of Classification as 1-A.

terview as the regulations require. It is true that the regulations at the time of the events here did provide both for a formal reclassification and notification by mail.[3] It is also true that courts of appeals have reversed convictions of registrants when their rights were prejudiced by failure of notification. United States v. Stiles, 3 Cir., 1948, 169 F.2d 455, explaining United States v. Zieber, 3 Cir., 1947, 161 F.2d 90; United States v. Fry, 2 Cir., 1953, 203 F.2d 638.

It is one thing, however, to protect a man when he is prejudiced by the failure of administrative authorities to observe the precautions taken to guard his rights. It is another thing to create an administrative procedure, designed to be handled by volunteer laymen in communities throughout the nation, as technical and ritualistic as common law pleadings. We have said in an earlier opinion that a registrant is not obliged to make his points with his draft board in the fashion required of a well-trained lawyer, United States ex rel. Berman v Craig, 3 Cir., 1953, 207 F.2d 888. It is likewise true that the board's proceedings do not need to be recorded with the meticulous accuracy with which an experienced corporation counsel draws a set of corporate minutes.

The present case is like Martin v. United States, 4 Cir., 1951, 190 F.2d 775, followed in Atkins v. United States, 10 Cir., 1953, 204 F.2d 269 in which the court refused to "quibble over terminology."

The course of decision on this matter has been a commendable one. If a registrant has been denied a chance to exercise rights given him under the statute and regulations his conviction has been reversed, as in the Zieber, Stiles, and Fry cases, cited above. On the other hand, as in the Martin and Atkins cases, where there has been substantial compliance, so that a man has had all the consideration due him, the courts have refused to reverse for mere technical irregularities. That, we believe, works substantial justice.[4]

We pass, therefore, to appellant's complaint that there is no support in the record for the classification given him. Since Estep v. United States, 1946, 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567, we are bound to make this inquiry, and if there is no basis in fact for the classification we must reverse the conviction. Dickinson v. United States, 1953, 346 U.S. 389, 74 S.Ct. 152; Annett v. United States, 10 Cir., 1953, 205 F.2d 689; United States v. Pekarski, 2 Cir., 1953, 207 F.2d 930; Taffs v. United States, 8 Cir., 1953, 208 F.2d 329, certiorari denied 1954, 347 U.S. 928, 74 S.Ct. 532; Schuman v. United States, 9 Cir., 1953,

---

3. "(c) After the registrant has appeared before the member or members of the local board designated for the purpose, the local board shall consider the new information which it receives and shall again classify the registrant in the same manner as if he had never before been classified.

"(d) After the registrant has appeared before the member or members of the local board designated for the purpose, the local board, as soon as practicable after it again classifies the registrant, shall mail notice thereof on Notice of Classification (SSS Form No. 110) to the registrant and on Classification Advice (SSS Form No. 111) to the persons entitled to receive such notice or advice on an original classification under the provisions of section 1623.4 of this chapter." 32 Code Fed.Regs. § 1624.2 (1949).

4. Under the present regulations, the board need not reclassify the registrant in the absence of new information justifying such a change. "(c) After the registrant has appeared before the member or members of the local board designated for the purpose, the local board shall consider the new information which it receives and, if the local board determines that such new information justifies a change in the registrant's classification, the local board shall reopen and classify the registrant anew. If the local board determines that such new information does not justify a change in the registrant's classification, it shall not reopen the registrant's classification." 32 Code Fed. Regs. § 1624.2 (1951). However, the notification requirement remains the same. See 32 Code Fed.Regs. § 1624.2 (d).

208 F.2d 801; Jewell v. United States, 6 Cir., 1953, 208 F.2d 770; United States v. Hartman, 2 Cir., 1954, 209 F.2d 366; United States v. Kobil, D.C. E.D.Mich.1951 (unreported); Ex parte Fabiani, D.C.E.D.Pa.1952, 105 F.Supp. 139; United States v. Graham, D.C.W.D. Ky.1952, 109 F.Supp. 377; United States v. Alvies, D.C.N.D.Cal.1953, 112 F.Supp. 618; United States v. Loupe, D.C.D.N.J.1953 (unreported); United States v. Burnett, D.C.W.D.Mo.1953, 115 F.Supp. 141; United States v. Lowman, D.C.W.D.N.Y.1954, 117 F.Supp. 595; United States v. Benzing, D.C.W.D.N.Y. 1954, 117 F.Supp. 598.

■ We start then with the task "to search the record for some affirmative evidence to support the local board's overt or implicit finding that a registrant has not painted a complete or accurate picture of his activities." Dickinson v. United States, supra, 346 U.S. at page 396, 74 S.Ct. at page 157.

■ We consider first the matter of Hagaman's claim to be classified as a minister of religion and, therefore, exempt from the draft under 50 U.S.C.A. Appendix § 456(g). It is settled that merely because he belongs to the body known as Jehovah's Witnesses, all of whose members claim to be ministers to preach the gospel to all the nations, he does not thereby become entitled to the

ministerial exemption under the statute and regulations. Dickinson v. United States, supra, 346 U.S. at page 394, 74 S.Ct. 152; Cox v. United States, 1947, 332 U.S. 442, 449–450, 68 S.Ct. 115, 92 L.Ed. 59. The ministerial exemption is a narrow one and has been rather fully described in the statute.[5] The burden is on the registrant to show that he comes within it. Dickinson v. United States, supra, 346 U.S. at page 395, 74 S.Ct. 152.

The administrative authorities were justified in finding that Hagaman did not so qualify. It is true that he was baptized at the age of eighteen into the "ministry" of this sect. And he claims to have been a minister from June, 1948, when he joined Jehovah's Witnesses. Of course, this is simply the claim all members make and, as said above, we must go further to find that he was a minister in the statutory sense. If, as pointed out in the Dickinson case, the flock is not to be left without a shepherd, it is equally true that the flock cannot consist of shepherds only.

When Hagaman was asked in the special form for conscientious objectors to name "the pastor or leader of such church, congregation, or meeting" he answered that it was one P. L. Talarico, who was the "company servant" for this particular group in Fort Lauderdale,

---

5. "(1) The term 'duly ordained minister of religion' means a person who has been ordained, in accordance with the ceremonial, ritual, or discipline of a church, religious sect, or organization established on the basis of a community of faith and belief, doctrines and practices of a religious character, to preach and to teach the doctrines of such church, sect, or organization and to administer the rites and ceremonies thereof in public worship, and who as his regular and customary vocation preaches and teaches the principles of religion and administers the ordinances of public worship as embodied in the creed or principles of such church, sect, or organization.

"(2) The term 'regular minister of religion' means one who as his customary vocation preaches and teaches the principles of religion of a church, a religious

sect, or organization of which he is a member, without having been formally ordained as a minister of religion, and who is recognized by such church, sect, or organization as a regular minister.

"(3) The term 'regular or duly ordained minister of religion' does not include a person who irregularly or incidentally preaches and teaches the principles of religion of a church, religious sect, or organization and does not include any person who may have been duly ordained a minister in accordance with the ceremonial, rite, or discipline of a church, religious sect or organization, but who does not regularly, as a vocation, teach and preach the principles of religion and administer the ordinances of public worship as embodied in the creed or principles of his church, sect, or organization." 50 U.S.C.A.Appendix § 466(g).

Florida.[6] Hagaman shows some evidence of preaching activities, but those instances are only seven in number at most.[7] It is true that Mr. Talarico, the company servant in Fort Lauderdale, wrote a letter in which he said he considered Hagaman "a regular minister of religion." He followed that statement by saying he "would not hesitate to assign him any of the duties regularly and customarily performed by an ordained minister," such as "conducting Bible studies, baptismal services, funeral discourses, marriage ceremonies," and so on. But "not hesitate to assign" is not the same as being assigned and carrying on these duties. There is evidence, undoubtedly, that Hagaman did engage in some religious activity, which he, himself, described as similar to that done by deacons in other denominations.[8] Everybody knows that a great deal of church work in every denomination is done by persons who devote themselves without compensation to the task. We know, too, that in many denominations laymen frequently make religious talks without thereby achieving in their own or anyone's mind any "ministerial status."

This case presents a problem of deciding on which side of the line Hagaman's activities fell. There were some things to indicate employment in a ministerial capacity. There were others to indicate that he had not reached in the service of Jehovah's Witnesses the place where he could be called a "minister" in the sense in which that term is used by the United States, however it may be used by Jehovah's Witnesses. That being the case, the decision is for the administrative authorities. Estep v. United States, supra, 327 U.S. at page 122, 66 S.Ct. 423.

We now come to the point on which the Court divides. We do not disagree with the majority here and the judges in other circuits who have refused to reject all Jehovah's Witnesses from the conscientious objector category because of the "theocratic warfare" point. But we do not see any basis for assuming that Hagaman's classification as a conscientious objector was made because of Jehovah's Witnesses' adherence to the doctrine of "theocratic warfare," whatever that may mean.

The conscientious objector claim, it may be agreed, is the most difficult point in the case. If, as the majority in the Dickinson case says, the draft boards are now to be obliged to build a record, we still have the question of how much of a record it is going to take to support their conclusions. Decisions have said that mere suspicion is not enough, Dickinson v. United States, supra, 346 U.S. at page 397, 74 S.Ct. 152; Schuman v. United States, 9 Cir., 1953, 208 F.2d 801. On the other hand we do not suppose that the courts are going to require draft boards to go out and make investigations in the community and bring

6. In the Dickinson case, supra, defendant was the "company servant" for Coalinga, California, and proved extensive preaching activities. We do not mean to indicate that only those Witnesses who are "company servants" can be exempted as ministers. See Cox v. United States, supra, 332 U.S. at pages 449–450, 68 S. Ct. 115.

7. In connection with one of those instances, there is an unexplained inconsistency, the significance of which we are perhaps not required to pass on. In the Board's file, which is in evidence, there is a photostat of a letter, dated May 2, 1951, from a man named Bruce E. Giffin in which he asked Hagaman to take his place in giving a discourse on Sunday, May 27, 1951. A circular announcement of the discourse accompanies the letter. But the postmark upon the photostat of the envelope attached thereto bears date June 3. The claim for deferred classification had been made in March, 1951.

8. Hagaman was admitted several weeks before he filled out his questionnaire to the group called "pioneers." Pioneers, as we understand it, are not "company servants" but are a step up in ranks of the hierarchy from ordinary members. They are obliged to perform 100 hours a month in the group service. Hagaman's comparison to the work done by the deacons in other denominations seems to us quite apt.

into their hearings witnesses to oppose claims for classification made by registrants. If they must do so, the administration of selective service laws will become a much more highly complicated process than it now is.

The question in this case, we think, should turn upon the administrative body's conclusion as to the sincerity of Hagaman's claim to be a conscientious objector. He did not have the same family background of membership in Jehovah's Witnesses that many others have had whose claims for conscientious objector classifications have come into litigation.[9] One parent was a Jehovah's Witness; the other was a Lutheran. The parents did not live together. The boy spent part of his time with each. When he was sixteen he entered the John B. Stetson University in Deland, Florida, a Baptist institution. In the document filled out at the time of his registration there in 1946 he gave his religious preference as Lutheran. He had two years of a Business Administration course at Stetson. He registered for the draft in September, 1948. He had joined Jehovah's Witnesses just three months before that.

People do change their religious views, of course, and there is no disposition on our part to deny the sincerity of a Road to Damascus conversion. On the other hand when such conversion comes a very short time before one may become liable for military service, the question is suggested whether the conversion is a real or pretended one. That, obviously, is a question of fact. The question of fact was passed upon by the local Board in the first instance unfavorably to the registrant. That body not only had the registrant's papers before it, but also had the benefit of hearing and seeing him in a personal interview. The hearing officer on appeal believed in Hagaman's sincerity after seeing him and that appeal sustained the conscientious objector classification though denying the ministerial exemption. The final

appeal restored the 1–A classification which the local Board had given.

When trial courts pass upon a question of fact, courts of appeals are to accept their conclusions unless clearly erroneous. When the question of fact is whether a given witness or litigant is telling the truth, it takes a very strong set of circumstances to prevail against the conclusion reached by the fact finder. Surely our supervision over the fact finders in the selective service process is not greater than that over trial courts. Legal questions, of course, we decide as we have in the first part of this opinion. And ultimate conclusions from evidentiary facts we can also pass upon to some extent. That is what we think the Supreme Court did in the Dickinson case, which dealt with the fact material out of which the claim for ministerial exemption arose. That is what we have done in the portion of this opinion dealing with the claim for exemption as minister. But when the question turns on a man's motives, review of the factual determination is a different thing. Two of the three bodies who have had Hagaman's case before them have ruled against his contention. We believe the factual conclusion should stand.

A suggestion from judicial sources that boards of appeals file reasons for conclusions is one which would make judicial review easier of course. "Opinions are required in our legal system in order that the reasoning which justifies a conclusion may be made manifest." Frankfurter, J., dissenting in Darr v. Burford, 1950, 339 U.S. 200, 225, 70 S.Ct. 587, 601, 94 L.Ed. 761. But the Congress, in setting up draft boards and the various boards of appeals, did not require findings of fact, conclusions of law or opinions. We do not think that judges are authorized to impose such a requirement.

All of us think that the judgment of the district court should be affirmed on the first two points stated above. But the majority overrules us on the point of the conscientious objector classification.

9. As for instance in Pine v. United States, cited in the majority opinion.

McLAUGHLIN and STALEY, JJ., join in the dissenting portion of this opinion.

### On Motion to Amend Opinion

PER CURIAM:

The court has considered appellant's motion to amend opinion by correcting or striking holdings on claim for exemption as minister of religion and has noted that it contains language so unrestrained as to raise a question whether zeal in advocacy has become impertinence. However, the court contents itself with this word of admonition that counsel exercise greater self-restraint in the future.

In the light of the motion the court deems it appropriate to note that nothing in its opinion is intended to prevent any Selective Service Board from considering any future claim of the registrant to exemption as a minister of religion in the light of whatever circumstances may exist when that claim shall be considered. With this explanatory statement, the motion is hereby denied.