UNITED STATES of America

v.

Truman Eugene WILLARD.

Crim. No. 23384.

United States District Court
N. D. Ohio, E. D.
June 4, 1962.

Merle M. McCurdy, U. S. Atty., N. D. Ohio, Gerald J. Celebrezze, Asst. U. S. Atty., N. D. Ohio, for plaintiff.

Hayden Covington, Brooklyn, N. Y., for defendant.

KALBFLEISCH, District Judge.

The defendant was indicted on November 9, 1961, for failure to obey an order of Local Board 79, Youngstown, Ohio, directing him to report to the Board for instructions to proceed to a place of employment to perform civilian work contributing to the maintenance of the national health, safety or interest, in violation of 50 U.S.C.A.Appendix, §§ 456 and 462.

A trial by jury was waived and, after opening statements, the Government introduced two exhibits, the Selective Service System's file pertaining to the defendant and a certified copy of a "Memorandum to National Selective Service Appeal Board Answering Questions Re Jehovah's Witnesses," dated June 25, 1958. The Government rested and defendant moved for a judgment of acquittal. The Court took the motion under advisement and the defendant rested without introducing any evidence. The parties were given time within which to file briefs and defendant has continued to be free on bond.

The Record (R.) in this memorandum refers to defendant's Local Board 79 file, Government's Exhibit No. 1.

The defendant, Truman E. Willard, a resident of Youngstown, Ohio, was born on July 7, 1937, and registered with Local Board 79 on July 11, 1955. Willard's Classification Questionnaire, filed

August 22, 1955, stated that he regularly served as a formally ordained minister of religion of the Watchtower Bible & Tract Society, Inc. Willard, a high school graduate, was unemployed at the time of registration but has worked at various jobs since that time. He was married in 1956 and has no children.

On August 29, 1955, the defendant filed a "Special Form for Conscientious Objector" (R. 31–34) claiming exemption from combatant and noncombatant training and service in the Armed Forces. On January 16, 1959, the defendant received a 1–A classification, whereupon he requested, and was granted, permission to appear personally before the Local Board. Willard appeared on March 20, 1959 before the three members of the Board and its secretary. (The hearing was reported and occupies fifty pages of transcript. R. 50–109.) The Board made detailed inquiry as to the basis of defendant's contention that he was not properly classified and the defendant freely stated his beliefs and arguments and introduced letters, affidavits and other exhibits. Willard said that his claim for exemption from both combatant and noncombatant training and service was based upon what he had been taught concerning the Bible and upon his own study thereof. (R. 52.)

Willard's letter requesting an oral hearing (R. 45) indicates that he was not interested in receiving a classification as a conscientious objector but that he sought total exemption as an ordained minister.

When he appeared before the Board, Willard was asked to state his "exact position" in his church. (R. 53.) Willard answered, "I might say I am an assistant to the presiding minister in Hubbard, Ohio—no,—I am his assistant in the capacity of training the congregation for ministerial activity, and house to house activity, or presentation at people's doors and am also responsible for the training of these members that are enrolled in this class—the proper presentation and delivery of material." (R. 53.)

Willard stated that he had been teaching Bible study groups since 1954 "and supervising ministerial activity from these groups." (R. 74.) In 1956 Willard "received an assignment" from the Watchtower Society's headquarters in Brooklyn, N. Y., to go to Sault Ste. Marie, Michigan, to teach a congregation of thirty-five persons. (R. 74.) He remained in Sault Ste. Marie for about a year before returning to Hubbard, Ohio, a suburb of Youngstown, "for a new assignment." (R. 75.) At the time of the hearing he was still assigned to Hubbard and was "responsible first for all Bible literature and Bible information that was to be presented to people's homes. * * * I was in charge of seeing all of this material was neat and orderly and well-kept, and I was responsible for giving it to the other ministers in the congregation for them to disperse. I was paid the money for the volumes and I turned it over in turn to the person who was responsible for the congregation. * * * [A] short time later I was assigned to give congregation instructions to the sixty-five people associated with us to help them to perform their worship in the right way. At this time I became what is known as Theocratic Ministerial Servant." (R. 75–76.)

Willard did not know how many of the sixty-five members of his congregation were ordained ministers, but he stated that there were seven ministers responsible for the various activities of the congregation. (R. 61, 84.)

In explaining the organization of the congregation in Hubbard and his position therein, Willard testified that the Congregational Servant is the Presiding Minister and that he has several Assistant Ministers. (R. 59.) However, the Assistant Congregational Servant, not the Assistant Ministers, would take over the duties of the Congregational Servant and preside over the congregation in the event of his absence or disability. The Assistant Ministers would, in turn, become assistants to the Assistant Congregational Servant. (R. 58.) Defendant testified that he was Presiding Minister

over various meetings or groups, but that he did not preside over the congregation. (R. 87.)

The Board inquired as to whether Willard could give an "accurate figure or estimate as to the number of hours, or weeks, or months, you devote to your ministerial duties?" In answer, Willard stated that his life was devoted to the ministry and teaching, that he had spent "eons of time just studying practically, and helping other individuals and visiting people." (R. 86.) He further testified, "I have no idea how many hours a week I spent on that. For a period of time during—let me check on that date—I devoted 100 hours expressly knocking at people's doors and delivering doorstep services that last about eight minutes." (R. 86.) Later Willard testified that he spent "10, 15 hours, I guess, a week" visiting homes and distributing pamphlets. (R. 92.) Nothing further appears in the record as to the number of hours per month Willard has spent in his ministerial work since graduation from high school. (R. 29, 30.) He testified that he had officiated at three funerals since he was ordained and has delivered a number of public "discourses" on the Bible. Since his appearance before the Board, Willard has performed one marriage ceremony. (R. 139, 140.)

At the time of the hearing Willard testified that he was unemployed, that his last place of employment was Saramar Aluminum where he had worked from May 16 to November 16, 1958. He testified that he was laid off for lack of work (R. 81) and that he was then collecting unemployment compensation. As to his prior employment, Willard testified that he had "worked quite a few places. Actually just jobs to sustain my ministry, that's all." (R. 82.) He then testified that he worked full time as long as the job didn't interfere with his ministry. The record shows that Willard was working as a carpenter in September, 1960 (R. 175), but that in March, 1961, he was again unemployed "secularly." (R. 184.)

In response to the Board's inquiry, the defendant testified that he would refuse to bear arms "because it is not lawful scripturally. * * * I could preach any place as long as there is another person to listen I can preach,—you can try and tell them what you know,—that is not the reason I am a conscientious objector, I am opposed because it is scripturally not correct." (R. 104.) When asked if he would be willing to perform civilian work in a hospital or similar institution, Willard replied that he would not, "because I couldn't carry out my ministerial obligations. As I said before, that is not the reason I want a minister's classification,—in case I am needed in certain places I feel that I have to be free to do things that are necessary to carry out my obligations." (R. 107.) The Board then inquired as to why he could not engage in assigned civilian work in view of his previous statement that he could preach as long as he had others to listen. Willard answered, "Yes, but that would be compromisable. In other words, you are giving that to me as an alternative. * * * and as an alternative that is not fair, because I am not asking for that, I am asking for what I feel the Bible entitles me to, a minister's classification." (R. 107–108.) Willard concluded his testimony by reasserting that if the Board would consider his background and talk with individuals who knew him they would come to the conclusion that his activities compare with those of a minister of an orthodox religion and that he felt he was deserving of a minister's classification so that he might carry out these activities.

Since 1955, when he first registered with Selective Service, defendant has submitted over twenty statements and affidavits of members of his congregation to the effect that they recognized him as a minister and attesting to his good character. The file also contains a copy of a Minister's License issued by the Probate Court of Mahoning County to Truman Willard on June 15, 1956, which recites that Willard had produced creden-

tials of his being a regularly ordained minister of the Watchtower Bible & Tract Society and authorizes him to perform marriage ceremonies within the State of Ohio so long as he continues to be a regular minister in the Society. (R. 120.)

Following his hearing, the Board, by a 3 to 0 vote, reassigned defendant from a 1–A classification to 1–0, a conscientious objector to be assigned to civilian work. The Local Board's summary of Willard's personal appearance, dated April 17, 1959, reads, in part, as follows:

"The Local Board recognized that the registrant has read much about his religion and publications of his Church. He impressed the Board as being a believer in a Supreme Being and could be likened to a conscientious Sabbath School teacher. We feel that the registrant is a clean-living young man with a fine religious background; however, we do not feel that the entire record places him in a 4–D classification under the Selective Service Regulations." (R. 126.)

On July 22, 1959, the defendant read and reviewed his personal appearance record and added explanations and corrections. (Government's Ex. 1, Selective Service System Classification Questionnaire, p. 8.)

In January of 1960, Willard's file was reviewed by the Local Board (R. 150) and forwarded to the Appeal Board, which affirmed the 1–0 classification. (Government's Ex. 1, Selective Service System Classification Questionnaire, p. 8.)

Willard reported for his physical examination, as ordered, on May 3, 1960 (R. 154) and was found acceptable. (R. 155.)

On May 31, 1960, the Local Board submitted, by letter, three types of approved civilian work to be selected or rejected by defendant. Willard rejected all three types of work. (R. 168.) The Government Appeal Agent did not recommend that the State Director of Selective Service either request the Appeal Board to reconsider its determination, or appeal to the President. (R. 171.)

Willard was next summoned to a meeting of the Local Board on August 9, 1960, where the civilian work program for conscientious objectors was explained to him, but he stated that he would refuse any such assignment and was willing to suffer the consequences. (R. 174.) On December 13, 1960, the Board recommended that defendant be assigned to hospital work at the Columbus State Hospital, Columbus, Ohio. (R. 180.) Willard was ordered to report to the Local Board on April 14, 1961, at 9:00 A.M., where he would "be given instructions to proceed to the place of employment" (R. 186, 187), but he failed to appear. (R. 188.) This prosecution followed.

■ The law does not provide for judicial review of actions by the Local and Appeal Boards and questions "concerning the classification of the registrant may be raised either in a petition for habeas corpus or as a defense to prosecution for failure to submit to induction into the armed forces." Witmer v. United States, 348 U.S. 375, 377, 75 S.Ct. 392, 393, 99 L.Ed. 428.

50 U.S.C.A.Appendix, § 454, provides in part:

"(a) Except as otherwise provided in this title * * * every male citizen of the United States * * * who is between the ages of 18 years and 6 months and 26 years * * * shall be liable for training and service in the Armed Forces of the United States * * *."

Exemption from training and service is provided for certain classes of persons including regular or duly ordained ministers of religion. 50 U.S.C.A.Appendix, § 456(g). These terms are defined in 50 U.S.C.A.Appendix, § 466(g) (1), (2) and (3).

50 U.S.C.A.Appendix, § 462, provides in part as follows:

"*Offenses and penalties*

"(a) Any member of the Selective Service System or any other person

charged as herein provided with the duty of carrying out any of the provisions of this title * * * or the rules or regulations made or directions given thereunder, who shall knowingly fail or neglect to perform such duty * * * or who otherwise evades or refuses registration or service in the armed forces or any of the requirements of this title * * * or who in any manner shall knowingly fail or neglect or refuse to perform any duty required of him under or in the execution of this title * * *, or rules, regulations, or directions made pursuant to this title * * * shall, upon conviction in any district court of the United States of competent jurisdiction, be punished * * *."

50 U.S.C.A.Appendix, § 460, provides in part:

"(b) The President is authorized—

&ast; &ast; &ast; &ast; &ast; &ast;

"(3) to create and establish within the Selective Service System civilian and local boards, civilian appeal boards, and such other civilian agencies, including agencies of appeal, as may be necessary to carry out its functions with respect to the registration, examination, classification, selection, assignment, delivery for induction, and maintenance of records of persons registered under this title * * *. Such local boards, or separate panels thereof each consisting of three or more members, shall, under rules and regulations prescribed by the President, have the power within the respective jurisdictions of such local boards to hear and determine, subject to the right of appeal to the appeal boards herein authorized, all questions or claims with respect to inclusion for, or exemption or deferment from, training and service under this title * * * of all individuals within the jurisdiction of such local boards. The decisions of such local board shall be final, except where an appeal

is authorized and is taken in accordance with such rules and regulations as the President may prescribe. * * * The decision of such appeal boards shall be final in cases before them on appeal unless modified or changed by the President. * * *"

Defendant's motion for judgment of acquittal is based on the grounds that Local Board 79 acted arbitrarily and capriciously and without basis in fact and denied him procedural due process in refusing him exemption from service as a minister of religion.

In its argument and brief on the motion and on the merits, the Government contends that defendant did not exhaust his administrative remedies by disobeying the order to report to Local Board 79, under the doctrine of Bjorson v. United States, 272 F.2d 244 (C.A. 9th, 1959), cert. den. 362 U.S. 949, 80 S.Ct. 859, 4 L.Ed.2d 867. That case was almost identical, factually, with the one now under consideration. Appellant, a member of Jehovah's Witnesses, had failed to obtain a ministerial exemption from service, but had been classified as a conscientious objector. He was ordered to report to his Local Board on a specified day to be given instructions to proceed to the Los Angeles County Department of Charities. He was indicted and convicted for disobedience of this order. The Court of Appeals held that he could not attack his classification or the Board's procedure in a criminal prosecution, relying on Falbo v. United States, 320 U.S. 549, 64 S.Ct. 346, 88 L.Ed. 305 which had held that, in order to test the propriety of their classifications, conscientious objectors are obliged to obey the orders of their local boards to report for work of national importance since "[c]ompletion of the functions of the local boards and appellate agencies, important as are these functions, is not the end of the selective service process. The selectee may still be rejected at the induction center and the conscientious objector who is opposed to noncombatant duty may be rejected at the civilian

public service camp." (Id., p. 553, 64 S.Ct. p. 348.)

Defendant urges that the Bjorson opinion is in conflict with the Supreme Court's holding in Dodez v. United States, 329 U.S. 338, 67 S.Ct. 301, 91 L.Ed. 331, and should not be followed. Dodez had claimed exemption from all service, military or civilian, as a minister of Jehovah's Witnesses, but had been found acceptable physically and had been classified as a conscientious objector. He was assigned to civilian work of national importance but was convicted in this Court for refusal to obey an order to report to a designated camp for service. The Circuit Court of Appeals affirmed the conviction, holding that by refusing to report at the camp he had failed to exhaust his administrative remedy and, therefore, was precluded from questioning his classification in the criminal proceedings. The conviction was reversed by the Supreme Court which found, after confession of error by the United States (Id., p. 344, 67 S.Ct. p. 304), that changes in the applicable regulations since the Falbo decision had relieved Dodez of the necessity of reporting to camp in order to complete the administrative process. The significant change in the regulations provided for pre-induction physical examinations which removed the possibility of registrants' being rejected at the induction centers or at work camps.

 The Court is of the opinion that, with respect to exhaustion of administrative remedies, the Dodez decision, not Falbo, is applicable to this case and defendant would not have been required to report to an assigned place of work in order to question the validity of his classification. However, this Court concurs with the result reached in the Bjorson case, supra, and holds that Willard did not exhaust his administrative remedy and would have done so only by reporting to his Local Board and receiving his final order as to where and when to report for civilian work.

 This is a criminal case, however, and, as the defendant came within a shade of exhausting his administrative remedy after obeying all prior orders of his Local Board, the Court is of the opinion that exclusion of any judicial review of Willard's classification on a narrow procedural ground, which cannot now be corrected, would be an injustice. Accordingly, it finds that these circumstances are "exceptional and unusual," permitting relaxation of the general rule requiring exhaustion of administrative remedies as a prerequisite to an attack on the proceedings. Glover v. United States, 286 F.2d 84, 90, 91 (C.A. 8th, 1961).

The small area of judicial review of actions by draft boards which is allowed to the courts has been defined by the Supreme Court in a series of decisions. In Estep v. United States, 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567, the defendant had been indicted for refusal to be inducted, claiming that the classifying agencies had acted arbitrarily and capriciously in denying his claim for total exemption as a minister of religion. The Court held that, while the statute provides that decisions by draft boards are "final" (50 U.S.C.A.Appendix, § 460(b) (3), supra), Congress had not intended that criminal sanctions "were to be applied to orders issued by local boards no matter how flagrantly they violated the rules and regulations which define their jurisdiction." (Id., p. 121, 66 S.Ct. p. 427.) The statutory provision means that such administrative orders are not to be given the "customary scope of judicial review which obtains under other statutes. It means that the courts are not to weigh the evidence to determine whether the classification made by the local boards was justified. The decisions of the local boards made in conformity with the regulations are final even though they may be erroneous. The question of jurisdiction of the local board is reached only if there is no basis in fact for the classification which it gave the registrant." (Id., pp. 122, 123, 66 S.Ct. p. 427.)

This rule was reaffirmed in Cox v. United States, 332 U.S. 442, 68 S.Ct. 115, 92 L.Ed. 59, and Dickinson v. United

States, 346 U.S. 389, 74 S.Ct. 152, 98 L.Ed. 132.

In the Cox case the three defendants, all Jehovah's Witnesses, were indicted for refusing to serve in civilian public service camps. They claimed full exemption as ministers of religion. The opinion of the Court (in which the Chief Justice and three Justices joined, the fifth Justice concurring in the result) held that, in each case, the local board had adequate basis to deny their requested classifications as regular or ordained ministers. The Court observed that two of the defendants "spent only a small portion of their time in religious activities, and this fact alone, without a far stronger showing than is contained in either of the files of the registrants' leadership in church activities and the dedication of their lives to the furtherance of religious work, is sufficient for the board to deny them a minister's classification." (Id., 332 U.S. p. 451, 68 S.Ct. p. 119.)

With respect to defendant Cox, the Court held that the records "suggest but do not prove" that he had spent full time as a pioneer for two years prior to his classification as 1–A and it said further, at page 451, of 332 U.S., at page 119 of 68 S.Ct.:

> "The board might have reasonably held that nothing less than definite evidence of his full devotion of his available time to religious leadership would suffice under these circumstances."

■ Whether there is basis in fact to support a draft board's classification is a question of law for the court and if the judge determines that there was such a basis in fact, "the issue need not and should not be submitted to a jury." (Id., p. 453, 68 S.Ct. p. 120.) The Court said in the Cox case:

> "Perhaps a court or jury would reach a different result from the evidence but as the determination of classification is for selective service, its order is reviewable 'only if there is no basis in fact for the classification.' Estep v. United States, supra, [327 U.S.] 122 [66 S.Ct. 427]. Con-

sequently when a court finds a basis in the file for the board's action that action is conclusive. The question of the preponderance of evidence is not for trial anew. It is not relevant to the issue of the guilt of the accused for disobedience of orders. Upon the judge's determination that the file supports the board, nothing in the file is pertinent to any issue proper for jury consideration."

In Dickinson v. United States, 346 U.S. 389, 74 S.Ct. 152, 98 L.Ed. 132, the defendant had claimed a ministerial exemption which was denied and he was indicted for refusing to report for induction. The Supreme Court reversed this conviction on the ground that the uncontroverted evidence before the Board had supported the registrant's claim and had placed him "prima facie within the statutory exemption" and that it could not be denied "solely on the basis of suspicion and speculation." (Id., p. 397, 74 S.Ct. p. 157.) In the Dickinson opinion the Court referred to the Senate Report accompanying the 1948 Selective Service Act, which characterized the ministerial exemption as " 'a narrow one, intended for the leaders of the various religious faiths and not for the members generally.' S.Rep. No. 1268, 80th Cong., 2d Sess. 13." (P. 394, 74 S.Ct. p. 156.) The Court stated that:

> "Certainly all members of a religious organization or sect are not entitled to the exemption by reason of their membership, even though in their belief each is a minister. Cf. Cox v. United States, 332 U.S. 442 [68 S.Ct. 115, 92 L.Ed. 59] (1947). On the other hand, a legitimate minister cannot be, for the purposes of the Act, unfrocked simply because all the members of his sect base an exemption claim on the dogma of its faith. That would leave a congregation without a cleric. Each registrant must satisfy the Act's rigid criteria for the exemption." (P. 394, 74 S.Ct. p. 156.)

■ Thus it is clear that, though the Board and this Court accept the "ecclesi-

astical determination of the governing body of Jehovah's Witnesses that he [Willard] is a minister and that the duties performed by him are the duties of a minister," (Brief, p. 55) these are not the only factors to be considered in determining whether, as a minister, he is entitled to the statutory exemption.

The Court said further, in Dickinson: "Preaching and teaching the principles of one's sect, if performed part-time or half-time, occasionally or irregularly, are insufficient to bring a registrant under § 6(g). These activities must be regularly performed. They must, as the statute reads, comprise the registrant's 'vocation.' And since the ministerial exemption is a matter of legislative grace, the selective service registrant bears the burden of clearly establishing a right to the exemption." (Pp. 394, 395, 74 S.Ct. p. 156.)

■ Defense counsel insists that the foregoing language in the Dickinson opinion, with respect to the amount of time spent preaching and teaching, was not necessary to the decision and was "erroneous dictum" which this Court should "overrule." (Brief, p. 58.) The evidence showed that Dickinson was devoting full time, a total of 150 hours per month, to preaching, teaching and other religious activities (Id., p. 393, 74 S.Ct. p. 155) and spent an average of five hours per week working as a radio repairman to support himself. Whether the statement of the Court with which counsel takes issue was or was not necessary to the decision of that case is of no moment since the opinions of the Supreme Court are always looked to for guidance by the lower courts.

■ In reviewing defendant's Selective Service file, the question first to be decided is whether the Board's classification of defendant as a conscientious objector, rather than as a minister, had any basis of fact in the record. The Court has carefully examined the entire file and is of the opinion that there was such basis.

The Watchtower Bible & Tract Society, Inc., appears to be a fundamentalist sect, all of whose members are considered ministers, either full or part time. (Government's Ex. 2, pp. 1, 2.) The Society lists 660 men from ages 18 to 25 (draft age) and a total of 6,469 men and women who are full time ministers in the United States. (Id., p. 2.) Total United States membership in the Society is listed at 204,010. (Id., p. 1.)

The statutory definitions of regular and duly ordained ministers of religion are contained in 50 U.S.C.A.Appendix, § 466(g), which reads as follows:

"(1) The term 'duly ordained minister of religion' means a person who has been ordained, in accordance with the ceremonial ritual, or discipline of a church, religious sect, or organization established on the basis of a community of faith and belief, doctrines and practices of a religious character, to preach and to teach the doctrines of such church, sect, or organization and to administer the rites and ceremonies thereof in public worship, and who as his regular and customary vocation preaches and teaches the principles of religion and administers the ordinances of public worship as embodied in the creed or principles of such church, sect, or organization.

"(2) The term 'regular minister of religion' means one who as his customary vocation preaches and teaches the principles of religion of a church, a religious sect, or organization of which he is a member, without having been formally ordained as a minister of religion, and who is recognized by such church, sect, or organization as a regular minister.

"(3) The term 'regular or duly ordained minister of religion' does not include a person who irregularly or incidentally preaches and teaches the principles of religion of a church, religious sect, or organization and does

not include any person who may have been duly ordained a minister in accordance with the ceremonial, rite, or discipline of a church, religious sect or organization, but who does not regularly, as a vocation, teach and preach the principles of religion and administer the ordinances of public worship as embodied in the creed or principles of his church, sect, or organization."

The record shows that defendant was duly ordained as a minister of the Society at the age of nine and that he is regarded by other members as a minister, a fact which is of little significance in itself inasmuch as all members are so regarded. The difficult question in attempting to determine whether a registrant should be exempt from all service as a minister of religion is whether "as his regular and customary vocation [he] preaches and teaches the principles of religion and administers the ordinances of public worship as embodied in the creed or principles of such church, sect or organization." 50 U.S.C.A.Appendix, § 466 (g) (1), supra.

At the time of his personal appearance before the Board, defendant had performed three funeral services but no marriages or baptisms. (R. 94.) His principal functions within the Society appear from the record to be the conduct of "Bible studies" and visiting homes delivering "doorstep services." The record indicates that defendant's periods of gainful employment have been irregular and infrequent. However, neither Willard's testimony before the Board nor the affidavits and statements which he submitted disclose with any degree of specificity the amount of time which he spends in ministerial work. In a letter to the Board, dated August 21, 1955, Willard stated that he spent approximately twenty-three hours per month "attending meetings of Jehovah's Witnesses" (R. 29), five hours per month preparing "instructive discourses" as a member of the Theocratic Ministerial School, two or three hours a month for participation in "our service meetings," and eighteen

hours per month for door to door services, a total of about forty-eight hours per month, only twenty-six of which appear to have been devoted to ministerial work. He stated that he had devoted one hundred hours per month as a summer vacation pioneer for three summers while attending high school. (R. 30.) In the 1955 letter, Willard further stated that he was waiting to enter the Bethel Home in Brooklyn, the Society's international headquarters, but apparently nothing came of this plan. (R. 30.)

The amounts of time spent either in ministerial work or in gainful employment are not positive tests, but they are objective, measurable facts which persons of judgment and experience, such as members of a local board would naturally consider in determining whether a registrant qualifies for exemption. Willard was vague in his testimony before the Board as to the time he was devoting to ministerial work, and there is nothing in the record to establish that he spent a substantial amount of time in this capacity. Nothing in the file indicates that defendant has occupied a position of leadership in his faith, or that a period of service to his Country would have left his "congregation without a cleric." Dickinson v. United States, 346 U.S. 389, 394, 395, 74 S.Ct. 152, 156. "He made no showing that he was a shepard of any flock." Tomlinson v. United States, 216 F.2d 12, 16 (C.A.9th, 1954), cert. den. 348 U.S. 970, 75 S.Ct. 528, 99 L.Ed. 755. A position of leadership in the congregation assumes greater significance in determining whether exemption should be given when the time spent in ministry is undetermined, irregular or insignificant. If mere interference with a registrant's ministerial activities is no ground for allowance of a claim to conscientious objection to noncombatant military service, as our Court of Appeals has held, it is certainly no basis for total exemption. Leifer v. United States, 260 F.2d 648 (C.A.6th, 1958), cert. den. 358 U.S. 946, 79 S.Ct. 351, 3 L.Ed.2d 351.

Examination of the record fails to reveal that defendant made any claim that

since his registration he has been a Pioneer or a full time minister. Although he submitted affidavits of the Congregational Servants (Presiding Ministers) in the cities of Salem and Niles attesting to his ministry, none was offered from his own Congregational Servant concerning the nature of his work and the amount of time which he devoted to it.

■ In this Court's judgment, Local Board 79 acted within its jurisdiction. The record shows that defendant was a male citizen between the ages of 18 and a half and 26 years, residing within the jurisdiction of the Board and acceptable for service, physically, at the time he was classified 1–O (50 U.S.C.A.Appendix, § 454(a), supra). The Court is further of the opinion that Willard did not make a prima facie case for exemption from both military and civilian service under 50 U.S.C.A.Appendix, § 456(g), 466(g) (1), (2) and (3), and that, therefore, there was basis in fact for the Board's actions in classifying him 1–O and ordering him to report for civilian work. This is the extent of permissible judicial review of these administrative proceedings. How the Board arrived at its conclusions, its reasoning processes, and its interpretation of the law are immaterial where the Court has found that there was a factual basis for the Board's action.

■ From examination of the record it is apparent that defendant was treated courteously by the Board and that he was given every opportunity over a six-year period to submit evidence in support of his claim. If the Board had any doubts as to what action it should take, it resolved them in Willard's favor by classifying him as 1–O. The Court finds that there was no denial of procedural due process to defendant before the Local Board or the Appeal Board.

■ Under the First Amendment of our Constitution, freedom to believe in and to adhere to one's chosen form of religion cannot be restricted by law, but freedom to act in accordance with one's religious beliefs necessarily "remains subject to regulation for the protection of society." Cantwell v. State of Connecticut, 310 U.S. 296, 303, 304, 60 S.Ct. 900, 903, 84 L.Ed. 1213.

A man who is relieved of the obligation to serve in any combatant branch of the Armed Forces because of his religious beliefs and then refuses to obey an order to perform civilian work in a hospital, after his Board, upon sufficient factual basis, has found that he does not come within the statutory exemption extended to ministers, is not simply exercising his freedom to believe and to worship as he pleases. If his position is valid, then, on the same basis, he could refuse to pay taxes or to assume the other secular burdens and obligations required of all persons living in a civilized society.

Defendant's motion for judgment of acquittal will be overruled and the Court finds the defendant guilty as charged.