**UNITED STATES of America,
Plaintiff,**

v.

**Don Olen STIDHAM, Defendant.**

**No. 5476.**

United States District Court
W. D. Missouri,
Central Division.

Dec. 16, 1965.

F. Russell Millin, U. S. Atty., John L. Kapnistos, Asst. U. S. Atty., Kansas City, Mo., for plaintiff.

George C. Adams, Columbia, Mo., for defendant.

JOHN W. OLIVER, District Judge.

Defendant, a Jehovah's Witness, was indicted for failing to report for and perform civilian work as ordered by Selective Service Board No. 10, Boone County, Columbia, Missouri, in alleged violation of Section 456(j) [1] and 462(a) of Title 50

---

[1]. The pertinent portion of Section 456 (j), Title 50 App., United States Code, provides: "Any person claiming exemption from combatant training and service because of such conscientious objections whose claim is sustained by the local board shall, if he is inducted into the armed forces under this title, be assigned to noncombatant service as defined by the President, or shall, if he is found to be conscientiously opposed to participation in such noncombatant service, in lieu of such induction, be ordered by his local board, subject to such regulations as the President may prescribe, to perform for a period equal to the period prescribed in section 4(b) such civilian work contributing to the maintenance of the national health, safety, or interest as the local board may deem appropriate and any such person who knowingly fails or neglects to obey any such order from his local board shall be deemed, for the purposes of section 12 of this title, to have

Appendix, United States Code. Jury trial was waived. As the trier of the facts, we must return a verdict of guilty. In accordance with our usual practice, we shall detail the reasons for our findings.

### Introductory

Defendant was placed by the Board in Class I–O: Conscientious Objector available for civilian work contributing to the maintenance of the national health, safety or interest. At the outset of the trial the parties agreed that "all the essential elements of the offense may be taken by the Court as having been established if, but only if, the defendant's classification was a valid classification." (Tr. 4).

Consistently from the outset of the trial, defendant has contended that "as a

matter of law * * * his present conscientious objector classification, I–O, is an improper classification and that on the basis of the data before the draft board, the draft board had jurisdiction only to classify the defendant in accordance with his claimed exemption as a minister, or a classification of IV–D" (Tr. 5–6).

Defendant concedes that "the burden of proof establishing an exemption is upon the registrant claiming the exemption." He argues, however, that "absent evidence indicating misrepresentation, once a registrant establishes prima facie that he is entitled to a ministerial classification, he is entitled to that classification and exemption as set out in the Selective Service Act"[2] (Defendant's Suggested Conclusion of law No. 2).

knowingly failed or neglected to perform a duty required of him under this title [sections 451–454 and 455–471 of this Appendix]."

2. The exemption, established by Section 456(g) of Title 50, App., United States Code, reads as follows: "Regular or duly ordained ministers of religion, as defined in this title, and students preparing for the ministry under the direction of recognized churches or religious organizations, who are satisfactorily pursuing full-time courses of instruction in recognized theological or divinity schools, or who are satisfactorily pursuing full-time courses of instruction leading to their entrance into recognized theological or divinity schools in which they have been pre-enrolled, shall be exempt from training and service (but not from registration) under this title."
Regulation 1622.43 [32 CFR 327] set forth both the Selective Service Regulation and the pertinent statute. It reads:
"§ 1622.43 Class IV–D; Minister of religion or divinity student.
(a) In Class IV–D shall be placed any registrant:
(1) Who is a regular minister of religion;
(2) Who is a duly ordained minister of religion;
(3) Who is a student preparing for the ministry under the direction of a recognized church or religious organization and who is satisfactorily pursuing a full-time course of instruction in a recognized theological or divinity school; or
(4) Who is a student preparing for the ministry under the direction of a rec-

ognized church or religious organization and who is satisfactorily pursuing a full-time course of instruction leading to entrance into a recognized theological or divinity school in which he has been pre-enrolled.
(b) Section 16 of title I of the Universal Military Training and Service Act, as amended [Section 466(g), Title 50 App., United States Code] contains in part the following provisions:
"Sec. 16. When used in this title— * * * (g) (1) the term 'duly ordained minister of religion' means a person who has been ordained, in accordance with the ceremonial, ritual, or discipline of a church, religious sect, or organization established on the basis of a community of faith and belief, doctrines and practices of a religious character, to preach and to teach the doctrines of such church, sect, or organization and to administer the rites and ceremonies thereof in public worship, and who as his regular and customary vocation preaches and teaches the principles of religion and administers the ordinances of public worship as embodied in the creed or principles of such church, sect, or organization.
(2) The term 'regular minister of religion' means one who as his customary vocation preaches and teaches the principles of religion of a church, a religious sect, or organization of which he is a member, without having been formally ordained as a minister of religion, and who is recognized by such church, sect, or organization as a regular minister.

Defendant places principal reliance upon Estep v. United States, 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567 (1946); Dickinson v. United States, 346 U.S. 389, 74 S.Ct. 152, 98 L.Ed. 132 (1953); Pate v. United States, 5 Cir. 1957, 243 F.2d 99; and Wiggins v. United States, 5 Cir. 1958, 261 F.2d 113, cert. den. 359 U.S. 942, 79 S.Ct. 723, 3 L.Ed.2d 676, reh. den. 359 U.S. 976, 79 S.Ct. 874, 3 L.Ed.2d 843. Quite fundamentally, as we shall develop later in detail, this case turns on whether defendant did in fact establish a prima facie case before his Board that he was entitled to IV–D rather than a I–O classification.

In order that the basis of our general finding of guilty be clear we shall, in accordance with Rule 23(c) of the Rules of Criminal Procedure, also find the facts specially and state the conclusions of law applicable to those facts.

*Findings of Fact*

At the request of both parties we find that:

1. The defendant Don Olen Stidham was given a I–O Classification by the Selective Service Board No. 10 on January 15, 1964, by a vote of 5 to 0.

2. Defendant Stidham appealed his I–O Classification by informing Selective Service Board No. 10 that he was dissatisfied with the I–O Classification.

3. The entire Selective Service file of Board No. 10, which is often referred to as the cover sheet, was forwarded to the Missouri Appeal Board in accordance with Selective Service regulations for appropriate consideration.

4. The Appeal Board after considering Mr. Stidham's case affirmed the decision of the Selective Service Board to maintain the classification of I–O for Mr. Stidham. The vote was 5 to 0, taking place on March 19, 1964.

5. Defendant Stidham was issued an order to report for civilian work and statement of employer, stating to him that he had been found acceptable for civilian work contributing to the maintenance of the national health, safety or interest and that he had been assigned to institutional work located at the University of Missouri Medical Center at Columbia, Missouri; that he was ordered to report to Local Board (Selective Service Board No. 10 in Columbia, Missouri), at 10:00 a. m. on July 8, 1964, where he would be given instructions to proceed to the place of employment and to remain in the said employment for 24 consecutive months or until such time as he had been released or transferred by proper authority. The order carried the further statement that failure to report at the hour and on the day designated in the order would constitute a violation of the Universal Military Training and Service Act, as amended, which is punishable by fine or imprisonment or both. The order was signed by the Clerk of Selective Service Board No. 10, Mrs. Della Faye Pauley.

6. Defendant Stidham failed and refused to report as ordered by the said order described in 5 above and entered a statement stating:

At a meeting held as required under Section 1660.20(c) agreement was not reached and I will not accept civilian work in lieu of induction.

/s/ Don O. Stidham

dated May 27, 1964.

7. Pursuant to the stipulation and agreement made by counsel for plaintiff and defendant, defendant had exhausted all his administrative remedies and there

(3) The term 'regular or duly ordained minister of religion' does not include a person who irregularly or incidentally preaches and teaches the principles of religion of a church, religious sect, or organization and does not include any person who may have been duly ordained a minister in accordance with the ceremonial, rite, or discipline of a church, religious sect, or organization, but who does not regularly, as a vocation, teach and preach the principles of religion and administer the ordinances of public worship as embodied in the creed or principles of his church, sect, or organization."

was no procedural question involved in this case.

In discharge of "the task of the courts * * * to search the record for some affirmative evidence to support the local board's overt or implicit finding that a registrant has not painted a complete or accurate picture of his activities" (Dickinson v. United States, 346 U.S. at 396, 74 S.Ct. at 157), and to ascertain whether, on that record, "registrant's claim places him prima facie within the statutory exemption" (346 U.S. at 397, 74 S.Ct. at 158), we review the defendant's complete Selective Service file. Our further specific findings will be made in narrative form.

Defendant, born October 21, 1942, registered with Local Board No. 10 of Columbia, Missouri on October 26, 1960. Defendant stated in verified SSS Form No. 1 that the "State Farm Insurance Company" was the firm by whom he was then employed and that his occupation was that of a "file clerk".

On November 20, 1960, defendant gave the following answers to the Series V question relating to Occupation in his Classification Questionnaire, SSS Form No. 100 (defendant's answers are underlined as they were in the form):

Series V.—OCCUPATION
If Engaged in Agriculture,
Also Fill in Series VI

1. The job I am now working at is
   . . .
   Application file clerk

2. I do the following kind of work in my present job. . . .
   File application for insurance policy and the insurance policy after it is issued.

3. My employer is State Farm Insurance

   (Address . . . ) State Farm Mutual Missouri office, Columbia, Mo.

   (. . . business . . .) Insurance

4. (a) I was employed by my present employer on Sept. 18, 1960

   (b) I entered the job described in items 1 and 2, this series on Sept. 18, 1960

   (c) I am paid at the rate of $234.39 . . . per month

   (d) I work an average of 38.45 hours per week.

5. Other business or work in which I am now engaged in is Worked on farm for dad

6. Other occupational qualifications, including hobbies, I possess are None

7. My prior work experience is Working on farm and hauling hay in the summer.

Defendant also answered the questions in Series VI, relating to Agricultural Occupation, apparently on the theory that he was "engaged in agriculture". In those answers he stated he was an "unpaid family worker;" that he was "not personally responsible for the operation of the farm where I work;" but that he "always help[ed] his father with the hogs and cattle."

Defendant also signed Series VIII of the questionnaire, the Conscientious Objector section, which stated that "by reason of religious training and belief I am conscientiously opposed to participation in war in any form and hereby request that the local board furnish me a Special Form for Conscientious Objector (SSS Form No. 150)."

Although defendant was to subsequently represent to the Board that he had in fact been a "duly ordained minister" since April 16, 1955 (defendant would have been twelve years old at that time) no mention of that claim of occupation was made in his Classification Questionnaire.

Defendant, with the assistance of his mother, also a Jehovah's Witness, who described herself as a "minister and housewife," filed his Special Form for Conscientious Objector, SSS Form 150,

on November 28, 1960. As a part of defendant's answers to that form, a copy of Vol. LXXII, No. 3, of the Watchtower, under date of February 1, 1951 was attached and incorporated as a part of defendant's answers by reference. It is not necessary to make detailed analysis of that document because the Board always recognized defendant's full claim as a conscientious objector by its consistent I–O classification.

The Board sent defendant a Current Information Questionnaire, SSS Form No. 127, on November 18, 1963. It was returned November 23, 1963. The questions in Series IV, entitled "Present Occupation" were answered as follows:

1. The job I am now working at is . . . I am a minister (which work I perform free) To provide material needs I work as night supervisor in mail & File.

2. I do the following kind of work in my present job . . . Supervise the pulling & filing of applications

3. My employer is State Farm Mutual Insurance Co.
(Address . . .) 1800 Business Loop 70 W Columbia, Mo.
(. . . business . . .) Insurance

4. I have been employed on this job for 3 years and 2 months.

5. List any other occupational qualifications, including hobbies, you possess [No answer]

6. I speak fluently the following foreign languages or dialects [no answer]

7. I read and write well the following foreign languages or dialects [no answer]

Defendant was first classified I–O on November 26, 1963. On December 6, 1963, signing himself "Don O. Stidham, Ordained Minister," he wrote the Board two letters. The first stated that:

Being an Ordained Minister I am dissatisfied with my classification. Therefore subject to the right of personal appearance I do appeal my classification.

The second, much more detailed, stated in part that:

I am writing in reference to my classification. I received my classification of I–O and as I am an Ordained Minister I am dissatisfied with this classification.

I would like an appearance before the Local Board that I might establish with them the fact that I am an Ordained Minister.

\*    \*    \*    \*    \*    \*

As regards a regular minister note the views of Gen. Hershey, in the attached article. He states that some ministers work to sustain themselves but are still Ordained Ministers. This does not discredit their vocation of Ministry because they are living primarily for the ministry, but it is necessary for them to earn their material needs elsewhere.

\*    \*    \*    \*    \*    \*

On April 18, 1955, I was Ordained by a ceremony of ordanation [sic] given by the Watchtower Bible & Tract Society. Since this time of my being ordained the Watchtower Society recognizes me as a Minister, and has shown this by appointing me to a Servants position. There are eight Servants in each Congregations to make up the Servant Body, these care for all the ministerial needs of the congregation. My position in the Congregation is to care for all the literature from the Society. For such a responsible position one has to meet rigid specifications as stated in God's Word the Bible. Certainly only an Ordained Minister could receive such an appointment.

On Point No. (3) A student preparing for the ministery. [sic] I have been enrolled in the Theocratic Ministery [sic] School under the di-

rection of the Society for a number of years. We do not graduate from this school but continue to study God's Word regularly to all ways improve our Ministery. [sic] [3]

In view of the regulations discussed in this letter I request a personal appearance before you to present additional information and facts and also to answer any questions you might have.

The record is not clear whether the attached article in which Lt. Gen. Hershey was quoted was written by the defendant or copied from some Jehovah's Witness publication. It is clear, however, that the doctrinal statement of dogma is typical of the theological position maintained in familiar Jehovah Witness publications. Both the article attached by the defendant to his December 6, 1963 letter and the Watchtower article attached to his SSS Form 150 in 1960 contain numerous statements that ultimately lead to belated judicial recognition of the fact that "it is the doctrine of the Jehovah's Witnesses that all are ministers", Witmer v. United States, 348 U.S. 375, at 382, 75 S.Ct. 392, at 396, 99 L.Ed. 428, footnote 4 (1955), and that "under the doctrines of this sect [Jehovah's Witnesses] each member is a minister," Gonzales v. United States, 348 U.S. 407 at 408, 75 S.Ct. 409 at 410, 99 L.Ed. 467 (1955).

And it is also clear from the two articles that it is Jehovah's Witnesses' doctrine that at least so far as ministers are concerned, it is God's Word that appoints all ministers and that such persons whom Jehovah's Witnesses say God's Word appointed are to be recognized by a Selective Service Board as a "regular or duly ordained minister of religion", within the meaning of the laws of the United States.

Defendant contends that this is true even though such a person may not "regularly, as a vocation, teach and preach the principles of religion and administer the ordinances of public worship as embodied in the creed or principles of his church, sect, or organization," as required by Section 466(g), Title 50 App., United States Code.

Defendant's position in this case, reflecting the doctrine and dogma of Jehovah's Witnesses, is that a minister is a minister; that all Jehovah's Witnesses are duly ordained ministers appointed by God's Word; that all such ministers when so appointed and certified by Jehovah's Witnesses must be recognized as such by Selective Service Boards; and that is the end of that.

The Scriptural base most frequently cited by Jehovah's Witnesses in support of their ministerial doctrine is Numbers 1:45–54; 2:32, 33. The Watchtower article (Exh. I–YY) argues that those Biblical references establish with absolutism that "the consecrated priests and Levites were exempted from conscription for military service in Israel." It then argues generally that "God now exempts [Jehovah's Witnesses], not requiring them to fight as did Joshua, Gideon, Samson, Jephtah, Barak and David of ancient times."

Speaking to more modern times, the Watchtower article states:

In the United States of America the Selective Service Act of 1948 exempts ordained and regular ministers of the gospel from military obligations. * * * *Each one* of Jehovah's witnesses has as his vocation the ministry and is a minister of the gospel, whether able to render full time or only part time. * * * *Each and every one* of Jehovah's

---

3. "Point No. (3)" was a reference to paragraph (3) of Regulation 1622.43 quoted in footnote 2 above. Defendant purported to quote that regulation accurately in a part of his letter. He failed, however, to quote that portion of paragraph (3) that provides that a student preparing for the ministry must

be "pursuing a full-time course of instruction in a recognized" theological or divinity school. Defendant's inaccuracy in quotation is not a matter of paramount significance because no attempt was made either before the Board or in this Court to claim exemption as a student preparing for the ministry.

witnesses is under a vow of dedication, which involves 'duties superior to those arising from any human relation.' God's Word therefore appoints *each and every one* of them a minister of God and preacher of the Kingdom gospel; and officers of the law of the land, while having a legal right to do so, have no Scriptural right to discriminate and limit military exemption only to some, while excluding others. In doing so they must take responsibility before God for 'framing mischief by law'. [Emphasis ours].

The concluding paragraph of the Watchtower article states:

Jehovah's witnesses * * * are not pacifists, but are ministers and conscientious objectors *on Scriptural grounds*. In taking this stand the boards have been enabled to see that Jehovah's witnesses stay neutral toward this world and that they remain *God's ministers and ordained preachers* of the good news of his kingdom under Christ, *with Scriptural* and conscientious *objection* to their participation in worldly war in any form. [Emphasis ours].

The article attached to defendant's letter of December 6, 1963 (Exh. I–VV) concludes with the statement that "the Scriptures leave no doubt that Jehovah God has the right to determine how his servants shall be organized and what marks a Christian minister." It is replete with Biblical quotation and also quotes extensively from an article written by Lt. Gen. Lewis B. Hershey written in 1956.

Most important, however, for purposes of this case, the article made specific reference to the organizational structure of Jehovah's Witnesses. Recognition was there made that even from the Jehovah's Witnesses' viewpoint, there were different types of ministers within the organization.

Consistent with the doctrine recognized in *Witmer* and *Gonzales* that "all are ministers" and "each member is a minister," the attached article stated:

Most Christian ministers of Jehovah must provide for their own livelihood and look after their families. Usually these can spend only a limited number of hours each week in preaching activity, in this regard being like the apostle Paul at the time he was making tents.

In further refinement of doctrinal concept and with explicit recognition of the Pioneer rank of minister, the article continued:

However, among these ministers are also to be found the *pioneer or full-time ministers*. *These devote a minimum of one hundred hours a month to actual preaching of the good news.* In addition thereto they devote many hours to personal study and to supporting congregational meetings. All of these are recognized as direct representatives of the Watch Tower Society, the governing body of Jehovah's Witnesses. Surely all of them in particular merit being recognized as ordained ministers. How many conventional ministers preach one hundred hours each month? [Emphasis ours].

Nothing in either of defendant's letters of December 6, 1963, nothing in the attached article; in fact, nothing in anything ever submitted by the defendant to the Board even attempted to advise the Board of the actual number of hours defendant claimed he spent in teaching and preaching the principles of Jehovah's Witnesses. Nor did defendant ever specifically claim that his regular vocation was that of a minister. In short, defendant's claim of exemption was based in its entirety on Scriptural rather than factual grounds.

Defendant met with the Board on January 15, 1964. He presented particular exhibits that defendant now suggests require that we make a finding of fact "that the defendant presented evidence tending to show that he was a minister" (Defendant's suggested finding No. 2). We are of the opinion that the evidence presented to the Board can not be said to support that finding.

In our appraisal of defendant's exhibits to the Board, we have kept in mind the teaching of Dickinson that "certainly all members of a religious organization or sect are not entitled to the exemption by reason of their membership, even though in their belief each is a minister"; its teaching that "a legitimate minister cannot be, for purposes of the Act, unfrocked simply because all the members of his sect base an exemption claim on the dogma of its faith" (346 U.S. at 394, 74 S. Ct. at 156, 98 L.Ed. 132); and the corollary that the dogmatic beliefs of a particular sect cannot place the ministerial frock upon one or all of its members by the simple expedient of using statutory language to express their construction of the Scripture.

■ The problem, as suggested by Judge Goodrich in United States v. Hagaman, 3 Cir. 1954, 213 F.2d 86 at 93, is whether defendant presented evidence to the Board sufficient to make a prima facie case that he was contending that "he could be called a 'minister' in the sense in which that term is used by the United States, however it may be used by Jehovah's Witnesses." Defendant's exhibits presented to the Board did not make that sort of a case for reasons we shall state in detail.

Exhibit I–MM established that on June 15, 1963, the Watchtower Bible and Tract Society of New York, Inc., appointed defendant as a "Literature Servant." Exhibit I–LL established that on December 10, 1963, four days after the defendant protested his I–O classification, the Society issued its usual form of "Certificate for Servant in Congregation".

That certificate, of course, on its standard printed form, certified that defendant "is a duly ordained minister of Jehovah's Witnesses;" that he was "duly ordained * * * by a public ceremonial" on April 16, 1955 (only the date was filled in by typewriter); and that "he presently officiates as an assistant presiding minister of" the Columbia, Missouri, Congregation of Jehovah's Witnesses (these words were also typed into blank spaces on the printed form).

The only other facts that were certified by the Society as being specifically applicable to the defendant were the following:

He has been serving since June 15, 1963 as the Literature Servant for this congregation. As such he has supervision of Bibles and this Society's publications and general oversight of their distribution throughout the assigned territory of the congregation.

The certificate, of course, did not purport to say how much of defendant's time was occupied by those duties nor even how much time should be devoted to those duties. So far as its evidentiary value was concerned, all the certificate amounted to was that defendant was in fact the Literature Servant for the Columbia congregation of Jehovah's Witnesses and that he had been serving as such since June 15, 1963, as was already evidenced by Exhibit I–MM.

■ We can not believe that every Jehovah's Witness registrant makes a prima facie case for a ministerial exemption by merely filing the sort of standard printed form of Certificate from the Watchtower Bible and Tract Society of New York, Inc., as was filed in this case.[4]

---

4. We, of course, do not have the sort of certificate involved in this case as was involved, and set forth in full in Pate v. United States, 5 Cir. 1957, 243 F.2d 99, footnote 2 on page 101. While there is common language in the certificate involved in Pate and the defendant's certificate here involved, the differences are striking and reflect the organizational differences in the status of particular types of "ministers" as recognized by the

Watchtower Bible and Tract Society itself.

In the Pate certificate, for example, Pate was recognized not only as a "duly ordained minister" but it was also certified, totally different from defendant's certificate, that Pate, as a "duly ordained minister * * * [was] engaged, *as his customary vocation,* in preaching and teaching," etc. Pate's certificate also

Defendant's remaining exhibits were equally deficient to make a prima facie case.

Thomas Tilton, the Ministry School Instructor in the Columbia, Missouri Congregation of Jehovah's Witnesses, stated (Exh. I–SS) that he had personally known defendant since 1956· and that he had "observed his progress in the ministry". Tilton also stated that defendant "has also shown himself capable to teach others, having given several instructive talks in the local ministry school"; and "that he [the defendant] also delivers Bible talks from the public platform". Tilton purported "to certify" and to "recognize [defendant] as a duly ordained minister entitled to the courtesies extended by the Selective Service Act."

Letters from Marvin Richardson, Presiding Minister of the Hallsville Congregation of Jehovah's Witnesses (Exh. I–RR) and from Delmar Autry, Presiding Minister of the Boonville Congregation of Jehovah's Witnesses (Exh. I–NN), established that defendant had made talks in each of those two small towns near Columbia on December 8, 1963, and December 1, 1963, both dates, of course, being subsequent to receipt by defendant of his I–O classification.

No other evidence was presented to the Board that defendant had ever publicly spoken to any other Jehovah's Witnesses congregations or elsewere. We do not believe that those two speaking engagements, both made shortly after defendant's I–O classification can be said to establish a prima facie case that de-

fendant's regular vocation was that of a minister. We so find.

■ Nor do the letters from Everett A. Dahlquist (Exh. I–PP) and Frank S. Gillespie (Exh. I–OO) add any factual data that could be said to make a prima facie case. Everett A. Dahlquist, writing as the Presiding Minister of the Columbia, Missouri Congregation of Jehovah's Witnesses, urged the Board to accept "the fact that Donald O. Stidham is a minister of religion in that he serves our congregation as literature servant appointed by the Watchtower Bible and Tract Society of New York." Of course, the fact that defendant had been appointed literature servant does not establish that his regular vocation was that of a minister within the meaning of the laws of the United States.

Nor does the fact that the organizational nomenclature of Jehovah's Witnesses may give the name of "minister" to persons who in other congregations might be called a "deacon", an "elder", or some other name, add anything of substance to defendant's effort to establish a prima facie case that his regular vocation was that of a minister. Compare United States v. Hagaman, 3 Cir. 1954, 213 F.2d 86 at 93.

The remainder of Everett A. Dahlquist's letter stated:

Donald Stidham's appointment to the ministry requires him to give regular instruction to the congregation and individuals, to oversee the distribution of our Bible literature here in Columbia and also he is one of our traveling speakers that gives

---

certified that he was a " 'pioneer' minister and acts as a direct representative of this organization * * * in a territory assigned to him". Defendant's, of course, did not. The difference is one of real substance.

Pate's certificate showed on its face that he was the sort of "pioneer or full time minister" described in the article attached to one of defendant's letters of December 6, 1963 who, as stated in the article, "devote a minimum of one. hundred hours a month to actual preach-

ing of the good news." Defendant's certificate, of course, contained no such factual recitation.

As a practical matter, the inclusion of the words "duly ordained minister" in the printed form of defendant's certificate meant no more than when defendant was twelve years old he had. joined Jehovah's Witnesses and that all persons admitted into membership were, in accordance with Jehovah's Witnesses' doctrine, called "duly ordained ministers" as long as they remained members in good standing.

discourses one hour in length to other congregations in surrounding cities.

Donald Stidham's activities are carried out conscientiously and faithfully, and his ministry speaks well of him. I sincerely hope you will respect his identity as a minister of religion.

Defendant's evidence before the Board did not in any way indicate what, when, or where defendant in fact gave instruction to the congregation or individuals; what amount of time he spent in overseeing the distribution of literature in Columbia; or what discourses, other than the two talks made after defendant had received his I-O classification, he may have made to congregations in surrounding cities. It is one thing to say that one is an authorized traveling speaker; it is quite another to say that a traveling speaker both travels and speaks.

Frank S. Gillespie's letter (Exh. I-OO) merely states the unsupported conclusion that defendant "is a Christian minister devoting much of his time in serving the community by his preaching activities;" that he "has given public talks, holds a responsible position in his religious organization, and spends much time in ministering to and thus benefiting the community." How much "much time" may be is apparent neither from the letter nor from any other evidentiary data presented to the Board. What we have said in connection with other vague and relative appraisals of defendant's alleged activity makes further discussion redundant.

■ Defendant's final exhibit was a letter from his father, Ovie Lee Stidham

(Exh. I-QQ). Mr. Stidham advised the Board that he had been an ordained minister since 1947; that his entire family has been active with him since then; that the defendant has attended five meetings of Jehovah's Witnesses a week since he has been five years old; and that one of the weekly meetings that defendant was presently attending was held at the Theocratic Ministry School. Many of us have friends who attend church every day. Church attendance does not make a prima facie case that one is a minister.

Defendant's father's letter concluded with the argument that because the Watchtower Society has "recognized him [his son] as a minister" and because "Lt. Gen. Hershey recognized the Watchtower Society as a duly religious Organization and its representatives as ministers then I can see no reason why he should not be classified as one."

Defendant's father's letter, like all of defendant's evidence before the Board, rested upon the basic doctrinal concept that proof that one is entitled to be called "minister" within the framework of Jehovah's Witnesses constitutes proof that one is entitled to be classified as a minister within the meaning of the laws of the United States. The Congress passed specific legislation to prevent such a construction being given the Act.

Senate Report No. 1268, 80th Cong. 2d Sess. 13, to which reference was made in Dickinson (346 U.S. at 394, 74 S.Ct. at 156, 98 L.Ed. 132), expressly stated the Congressional policy that the amended ministerial exemption "is a narrow one, intended for the *leaders* of the various religious faiths and *not for the members generally*."[5]  (Emphasis ours). The

---

5. Senate Report No. 1268, U.S.Code Congressional Service 1948, p. 2001, commenting on what is now Section 466(g), Title 50 App., United States Code, stated: "(g) Deferment of ministers and ministerial students.—Regular or duly ordained ministers of religion, and certain theological and pretheological students, are exempt from induction but not registration. This sub-section parallels the 1940 act, except as regards pretheological students, who were not covered in the

original statute. Serious difficulties arose in the administration and enforcement of the 1940 act because of the claims of members of one particular faith that all of its members were ministers of religion. A minority of the Supreme Court thought that Congress intended to grant an exemption broad enough to include this group. (See the dissenting opinions in Cox v. United States, 332 U.S. 442, 455, 457 [68 S.Ct. 115, 92 L. Ed. 59]). In order that there may be

statement of Jehovah's Witnesses' dogma to the contrary by defendant's father did not create a prima facie case for the exemption of his son. We so find.

The Clerk of the Local Board testified at the trial that each member of the Board examined the six letters presented by defendant; that the members of the Board discussed the letters with defendant; that no member of the Board expressed any disbelief of any of the letters; that the Board considered defendant's occupation as that which had been stated to them by the defendant on his SSS Form 127; that there was no other evidence in the file concerning defendant's occupation; that the Board believed and felt that defendant's occupation had not changed from the time defendant completed his original questionnaire; and that everything the Board had considered was in the file.

In response to the question of what defendant's occupation "was, where he earned his money, how he spent his time?", the Clerk testified that the defendant had said that "he was employed at State Farm, and he also was a minister" (Tr. 20). The Clerk also testified that the Board recognized that all defendant's file showed was that he was "a servant in the congregation, a literature servant, which they did not feel qualified him for a minister's classification" and that "as a literature servant, he did not meet the test of a minister" (Tr. 22). The Clerk further testified that "had he [defendant] been something different [from a literature servant], he might have been a minister" (Tr. 22).

The Clerk testified that Local Board No. 10 used as a guide for the classification of Jehovah's Witnesses that those who had reached "the rank" of a "Congregational Servant, Pioneer, Member of Bethel Family, and Traveling Supervising Minister" were persons qualified as ministers entitled to a IV–D classification (Tr. 23). The Clerk testified that the Board did not have any evidence that defendant had been appointed or recognized as either "a Pioneer, a Traveling Supervisory Minister, a Congregational Servant, or a Member of the Bethel Family" (Tr. 25), and that defendant "had not presented evidence showing that he was one of those" (Tr. 26).

The Clerk also testified that "when we had a hearing with one of our members from State Headquarters, he asked him [the defendant] if he was one of these four, named them, and he said no" (Tr. 27). The record is clear that defendant made that statement after the order to report for civilian work had been made (Tr. 28, 29–30). But the record is also clear that no claim to the contrary was ever made to the Board before it finally classified defendant (Tr. 24).

Although the data was not before the Local Board at the time of its classification, defendant's Induction Form (Exh. I–JJ) dated February 6, 1964, consistently stated that defendant's "present civilian trade or occupation" was that of "filing and mail clerk for Insurance Co." and that the "length of [defendant's] experience" was 3 years and 4 months (Exh. I–JJ).

The Western District Appeal Board on March 19, 1964 denied defendant's appeal because it found that defendant "does not qualify as a minister within the meaning of Selective Service Regulations," adding, "Has not been certified as a Congregational Servant." (Exh. 6). In a manner not dissimilar from the answer given on defendant's Induction papers, the answers made by defendant on April 24, 1964 on SSS No. 152, the

no misunderstanding of the fact that the exemption granted is a narrow one, intended for the leaders of the various religious faiths and not for the members generally, the terms 'regular or duly ordained ministers of religion' have been defined in section 16(g). The definition is that which was contained in the 1917 Selective Service Regulations and which was successfully administered without the problems which arose under the 1940 act."

Of course, the reference to the "one particular faith" was a reference to Jehovah's Witnesses as the citation of Cox v. United States, 332 U.S. 442, 68 S.Ct. 115 (1947), makes apparent.

Special Report for Class I–O registrants, consistently reflected that "State Farm Ins." was still his employer; that the "date job started" was November 11, 1960; that defendant was still employed by that company; and that his job was "do claim work. Used to code for IBM machine."

As to the type of work defendant would do in lieu of induction into the Armed Forces, defendant stated that "the only work that I would do is to work for the Watchtower Society."

After appropriate proceedings, defendant was ordered to report for civilian work at the University of Missouri Medical Center (Exh. I–M). His indictment followed after he refused to comply with that order.

On the basis of our search of the record we find and determine that plaintiff's claim did not place him prima facie within the statutory exemption.

As an alternative ultimate finding, we find and determine that if notice of defendant's Scriptural claim could be said to have placed any facts concerning defendant's regular vocation in dispute, that defendant's admissions to the Board as to the nature of his regular occupation and employment by the insurance company was sufficient to afford a basis in fact for the I–O classification given defendant. The special facts as found and stated above support both the alternative ultimate findings just stated.

### Conclusions of Law

This case, like most, turns on its own particular facts. Discussion of the law as stated in two of the numerous Supreme Court cases that deal with ministerial exemptions for Jehovah's Witnesses is sufficient to establish the line on one side of which the factual circumstances of a particular case require it to be placed.

Dickinson v. United States, 346 U.S. 389, 74 S.Ct. 152, 98 L.Ed. 132 (1953), reversed a conviction, holding that there was no basis in fact in the record before the Board for denying Dickinson's claim to a ministerial exemption. By uncon-tradicted evidence submitted to his local Board Dickinson established that in August, 1949 he became "a full time 'pioneer' minister, devoting 150 hours each month to religious efforts" (346 U.S. at 392, 74 S.Ct. at 155); that in January, 1950 he became the " 'Company Servant' or presiding minister of the Coalinga, California, 'Company' " (346 U.S. at 393, 74 S.Ct. at 155); that in that capacity "he dedicated approximately 100 hours each month to actual missionary work— delivering public sermons, door-to-door preaching, conducting home Bible studies;" and that 50 additional hours of time were devoted to religious activities, the detail of which was fully established (346 U.S. at 393, 74 S.Ct. at 156). Dickinson also established before the Board that "he lived on $35 a month earned by a weekly average of five hours of radio repair work" (346 U.S. at 393, 74 S.Ct. at 156).

Dickinson's Board classified him in I–A and he was eventually convicted of refusing to submit to induction. The Supreme Court reversed. After noting that "each registrant must satisfy the Act's rigid criteria for the exemption," it was held that:

Preaching and teaching the principles of one's sect, if performed part-time or half-time, occasionally or irregularly, are insufficient to bring a registrant under § 6(g). These activities must be regularly performed. They must, as the statute reads, comprise the registrant's 'vocation.' And since the ministerial exemption is a matter of legislative grace, the selective service registrant bears the burden of clearly establishing a right to the exemption. (346 U.S. at 395, 74 S.Ct. at 156).

On the basis of the uncontradicted facts, the Supreme Court held that "we think Dickinson made out a case which meets the statutory criteria. He was ordained in accordance with the ritual of his sect and, according to the evidence here, he meets the vital test of regularly, as a vocation, teaching and preaching the principles of his sect and conducting

public worship in the tradition of his religion." (346 U.S. at 395, 74 S.Ct. at 157).

Under such a factual showing, the Supreme Court made clear that "the local board was free to disbelieve Dickinson's testimonial and documentary evidence" and that "when the uncontroverted evidence supporting a registrant's claim places him prima facie within the statutory exemption, dismissal of the claim solely on the basis of suspicion and speculation is both contrary to the spirit of the Act and foreign to our concepts of justice" (346 U.S. at 396 and 397, 74 S.Ct. at 158).

In Cox v. United States, 332 U.S. 442, 68 S.Ct. 115, 92 L.Ed. 59 (1947), the Supreme Court considered the cases of Cox, Thompson and Roisum, three Jehovah's Witnesses, who, like defendant in this case, were not satisfied with their conscientious objector classification and who insisted that they were entitled to total exemption as ministers.

In Cox's case, the evidence before his local Board was only that he was "able to average 150 hours per month to my ministerial duties without secular work" and that "my entire time *will* be devoted to preaching the Gospel as a pioneer" (332 U.S. at 444–445, 68 S.Ct. at 116). The Supreme Court noted that at his trial "no evidence was introduced showing the total amount of time Cox spent in religious activities * * *. Nor was there evidence of the secular activities of Cox nor the time employed in them" (332 U.S. at 445, 68 S.Ct. at 116).

Thompson stated in his questionnaire that he had operated a grocery store for 13 years. To support his ministerial exemption he submitted evidence to his local Board that he had devoted 519½ hours to field service; that he was an assistant company servant and school instructor and that he had also served his congregation as advertising servant and book study conductor (332 U.S. at 445–446, 68 S.Ct. at 115).

Like defendant in this case, "Thompson also filed a statement signed by twelve Witnesses which stated that they regarded Thompson as an ordained minister of the gospel" (332 U.S. at 446, 68 S.Ct. at 117). But again, like defendant in this case, "no evidence was submitted indicating any change in Thompson's activities in operating his grocery store" (332 U.S. at 446, 68 S.Ct. at 117).

Roisum's evidence before his local Board was that he was "an assistant company servant, a back call servant, and a book study conductor." The time schedule submitted by the Company Servant showed that "the number of hours which Roisum had spent in religious activities for six months [prior to classification] ranged from as little as 11 hours per month to as many as 69, averaging about 40" (332 U.S. at 447, 68 S.Ct. at 117).

Cox, of course, was decided before the 1948 amendment. The statute then provided exemption for "regular or duly ordained ministers of religion." The rationale underlying the construction given old Section 5(a) of the Act; old Section 622.44 of the Regulations; and Opinion No. 14 (amended), which related specifically to Jehovah's Witnesses, however, is consistent with the language and purpose expressed by the Congress when it enacted present Section 466(g). Indeed, the persuasiveness of the rationale of the majority opinion in Cox is enhanced both by the Supreme Court's "Compare" direction in Dickinson (346 U.S. at 394, 74 S.Ct. at 152), and by the Congressional rejection of Cox's dissent in Senate Document No. 1268 quoted in footnote 5 above.

In sustaining the convictions, the Supreme Court held that:

Our examination of the facts, as stated herein in each case, convinces us that the board had adequate basis to deny to Cox, Thompson and Roisum classification as ministers, regular or ordained. (332 U.S. at 451, 68 S.Ct. at 119).

Confining itself to an examination of the Selective Service files alone, the Supreme Court explained that:

The documents show that Thompson and Roisum spent only a small

portion of their time in religious activities, and this fact alone, without a far stronger showing than is contained in either of the files of the registrants' leadership in church activities and the dedication of their lives to the furtherance of religious work, is sufficient for the board to deny them a minister's classification. As for Cox, the documents suggest but do not prove that Cox spent full time as a 'pioneer' between October 1942 and May 1944 when he was ordered to camp.

Applying the teaching of Estep v. United States, 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567 (1946), the Supreme Court held in Cox that "whether there was 'no basis in fact' for the classification is not a question to be determined by the jury on an independent consideration of the evidence." (332 U.S. at 452–453, 68 S. Ct. at 120). And Cox also made clear that this question was to be determined by the courts on the factual record made before the Board. The Supreme Court pointed out that "the board records were made by" the registrants and that "it was open to them there to furnish full information as to their activities. It is that record upon which the board acted and upon which the registrant's violation of orders must be predicated" (332 U.S. at 454–455, 68 S.Ct. at 121).

The record made by the defendant in this case did not even suggest that the "customary vocation" that he "regularly" followed was that of a minister, within the meaning of the Act. The only evidence of defendant's vocation was that of an employee of an insurance company who had advanced from a file clerk to doing claims work during the three years continuous period of his employment.

As we have indicated in our factual findings, we do not believe that defendant's presentation of Scriptural arguments was sufficient to establish the sort of a prima facie case established in Dickinson. We do not believe that the data presented by defendant in this case even measured up to the quantum of proof presented by either Cox, Thompson or Roisum.

It is obvious that we have concluded as a matter of law that defendant's case falls on the side of the line of cases illustrated by Cox, and on the side opposite from those illustrated by Dickinson. We hold that defendant failed to make a prima facie case before the Board and that the Board's classification must be sustained because it rests upon a basis of fact established by defendant's own statements to the Board regarding his regular vocation as an insurance company employee.

And, in the alternative, as we have suggested above, even if it could be said that defendant's Scriptural arguments could be said to have been sufficient to have made a prima facie case before the Board, the defendant's own admissions on his Selective Service forms would have created no more than a factual conflict. It is the teaching of Dickinson that "if the facts are disputed the board bears the ultimate responsibility for resolving the conflict—the courts will not interfere" (346 U.S. at 396, 74 S.Ct. at 157). There is no evidence that the board acted arbitrarily or capriciously in making its appraisal of the facts presented to it by the defendant. There is therefore, in the alternative, no legal ground that could be said to warrant a refusal to sustain the board's classification. We so hold.

### Discussion of Fifth Circuit Cases Relied Upon by Defendant

Defendant has placed great reliance upon the 1958 decision of the Court of Appeals for the Fifth Circuit in Wiggins v. United States, 5 Cir. 1958, 261 F.2d 113, cert. den. 359 U.S. 942, 79 S.Ct. 723, 3 L.Ed.2d 676, and the earlier Fifth Circuit case of Pate v. United States, 5 Cir. 1957, 243 F.2d 99.

The cases in the Eighth Circuit, Weaver v. United States, 8 Cir. 1954, 210 F.2d 815, and DeRemer v. United States, 8 Cir. 1965, 340 F.2d 712, both involved conscientious objectors rather than exemptions for ministers. As pointed out in

Witmer v. United States, 348 U.S. 375 at 381, 75 S.Ct. 392 at 395, 99 L.Ed. 428 (1955), considerations come into play in conscientious objector cases that are not present in a ministerial exemption case.

In the case of a claim for exemption as a minister, the registrant must make out his prima facie case "by means of objective facts—[that] he was a 'regular or duly ordained minister of religion'" (348 U.S. at 381, 75 S.Ct. at 396). In the case of a conscientious objector "the registrant cannot make out a prima facie case from objective facts alone, because the ultimate question in conscientious objector cases is the sincerity of the registrant in objecting, on religious grounds, to participation in war in any form" (348 U.S. at 381, 75 S.Ct. at 396).

It is apparent that the nature of a particular registrant's claim—whether he claims to be a conscientious objector or a minister—determines the type and quantum of evidence needed to be presented to a Board in order to make a prima facie case.

Cases reviewing evidence presented in a conscientious objector case, which applying the same general rules of decision so far as the scope of judicial review is concerned, are nevertheless not particularly helpful as guides for the determination of a ministerial exemption case. Because the Eighth Circuit cases related to conscientious objectors rather than ministers, we must determine whether this Court should follow the Fifth Circuit rule of decision as announced particularly in Wiggins.

We need not decide whether the 1964 decision of the Fifth Circuit in Fitts v. United States, 5 Cir. 1964, 334 F.2d 416, is a distinct retreat from what that court held in Wiggins. Certainly this case is to be distinguished on the facts from Wiggins and Pate for the same reasons the Fifth Circuit held Fitts was to be distinguished from those earlier cases.[6] The difficulty, however, is that the Fifth Circuit held in Fitts that it was not retreating from Wiggins.

If, therefore, we must decide whether Wiggins, as read by defendant in this case, should be followed, we determine that it should not be followed.

We quite agree with what the Fifth Circuit said in Fitts that "one of the basic purposes of the [ministerial] exemption is to guard against a flock being left without a shepherd" (334 F.2d at 421). But we also agree with the Third Circuit when it said in United States v. Hagaman, 3 Cir. 1954, 213 F.2d 86 at 92, that while it is true that "the flock is not to be left without a shepherd, it is equally true that the flock cannot consist of shepherds only."

To which we would add that the members of a particular flock cannot, by the simple expedient of saying that God's Word has appointed all members of the flock as shepherds, thus qualify every member of the flock as a shepherd within the meaning of the laws of the United States. We think that Wiggins came close to permitting just that to be done.

We are of the opinion that on the facts, as stated in Wiggins, the Fifth Circuit's assumption that the position of a Book

---

6. In Fitts, consistent with the rules of decision announced by all other courts, it was held that "three basic considerations have guided the courts when reviewing the rights of Jehovah's Witnesses to ministerial exemptions." Those three basic considerations were spelled out as follows: "First, the registrant must have the ministry as a vocation rather than as an avocation; * * * Second, religious affairs must occupy a substantial part of the registrant's time and they must be carried on with regularity; * * * [and] finally, and most important, in order to obtain an exemption a registrant must stand in the relation of a minister to a congregation or in an equivalent relation as a recognized leader of a group of lesser members of his faith."

In Fitts, the Court said it held, on the facts, that an application of the quoted basic considerations served "to distinguish the case before us from Pate and Wiggins" (334 F.2d at 421). We hold only that this case is not controlled by those cases and that, like Fitts, it is to be distinguished from them.

Study Conductor within the organizational framework of Jehovah's Witnesses is a "position * * * roughly analogous to that of an assistant minister or assistant pastor" (261 F.2d at 118) is an assumption that we do not believe can be made. This is not to say that a certification of appointment of some position within a local congregation by the Watchtower Bible and Tract Society is not some evidence of a particular registrant's vocation; it is to say that we do not believe that a prima facie case can be said to be established by the filing of such a certificate alone. The only objective evidence adduced by the filing of such a certificate is that a Watchtower certificate was filed which reflected an application of Jehovah's Witnesses doctrine to a particular registrant.

This, of course, is not to say that a Selective Service Board should not make further and detailed fair factual inquiry upon the filing of a Watchtower certificate and upon the introduction of more objective evidence relating to a registrant's regular vocation, all of which should be accurately reflected in its records. How boards should proceed, and the sort of record they should make is illustrated by Fitts; how they should not proceed is illustrated by both Pate and Wiggins. With this specific phase of Wiggins, we are in agreement.

Our rejection of defendant's broader reading of Wiggins, and our rejection of Wiggins itself, if defendant's broad reading should be held to be a correct reading, is consistent with Judge R. Dorsey Watkins' analysis and decision of Wiggins in United States v. Tettenburn, D.C.Md.1960, 186 F.Supp. 203, and Judge Harrison L. Winter's concurrence with Judge Watkins in United States v. Stewart, D.C.Md.1963, 213 F.Supp. 497 at 503, aff'd, 4 Cir. 1963, 322 F.2d 592.[7]

Compare also United States v. Kutz, E.D. Wis.1961, 199 F.Supp. 205 at 209.

The two decisions of the District Court of Maryland made a valuable contribution to understanding the organizational framework of Jehovah's Witnesses. A certified copy of a "Memorandum to National Selective Service Appeal Boards Answering Questions Regarding Jehovah's Witnesses," dated June 25, 1958, submitted by Hayden C. Covington, General Counsel for Jehovah's Witnesses, to the National Selective Service Board, was admitted in evidence in Tettenburn (186 F.Supp. at 206). It was also offered in evidence in Stewart, but admitted subject to a motion to strike. Judge Winter in the latter case found it unnecessary to make reference to the memorandum in order to sustain the validity of the classification (213 F.Supp. at 503).[8]

Prompted by a concern that our understanding of the organizational framework of Jehovah's Witnesses was an accurate one, we, like Judge Watkins (see 186 F.Supp. at 206), reviewed many official publications of Jehovah's Witnesses, including the 1958 Memorandum of General Counsel Covington. Those publications (except those identified in our findings) and that memorandum of course, were not in evidence in this case. Like Judge Winter in Stewart, our decision in this case was made *without reference to those publications or to the memorandum, or other data not in evidence.*

Our study of that material, however, convinces us that our decision in this case is consistent with the official understanding of Jehovah's Witnesses of their own position under the Act; or, at least, with the understanding officially stated by its General Counsel in the years 1958 and 1959. The answers given to questions 14 and 19 in the Memorandum are, of course,

---

7. The Fourth Circuit's affirmance found that it was "not compelled to disagree" with Wiggins. The question of conflict between circuits therefore remained open.

8. See also United States v. Sturgis, 3 Cir. 1965, 342 F.2d 328 at 330, where reference to the Memorandum was made.

That opinion does not comment on whether or not the Memorandum was before either the Local Board or the District Court. The rationale of Sturgis and of the cases involving ministers decided by Courts of Appeals other than the Fifth upon which Sturgis relied could well be said to be in conflict with Wiggins.

the most significant.[9]  Our study of the official Jehovah's Witnesses' publications convinces us that the organizational description given by Judge Watkins on pag-

9. Those questions and answers quoted on page 208 of 186 F.Supp., are as follows:

"14.  Does the Watchtower Bible & Tract Society claim ministerial exemption for all Congregation Servants?

The Society does not claim exemption for congregation servants under the present law, except for those who are also pioneers or congregation servants (not pioneers) who can show that they are devoting their time to the ministry work of Jehovah's Witnesses sufficiently to claim that it is their vocation rather than their avocation.  While the time of the congregation servant devoted to his duties is substantial it does not alone constitute his vocation.  [see Preaching Together in Unity, page 29].  To qualify for exemption under the present law the congregation servant must show that he is devoting enough hours to the field ministry work of Jehovah's Witnesses, in addition to his duties as a congregation servant, to constitute it as his vocation.  He can do this even though he may not be a pioneer providing he devotes a substantial portion of his time to the ministry and shepherding the flock of God.

\*　　\*　　\*　　\*　　\*

19.  Will the Society agree that it will not press for ministerial status for anyone under the rank of pioneer?

Yes, except in the case of the congregation servant who is devoting a substantial amount of his time, not as a pioneer, which together with his duties as a congregation servant makes his ministry his vocation and not his avocation.  The Society is interested in defending only those persons who qualify for the exemption under the law of the land.  On such basis it does not contend that every minister in the organization is entitled to the exemption.  Only those ministers who meet the definition of vocation required by the statute are entitled to be given the exemption and these the Society can legally defend."

In a letter to Lt. General Hershey, Director of the Selective Service System, dated January 10, 1959, General Counsel Covington stated in part:

"Dear General Hershey:

The following information is supplied to you pursuant to the promise made by me to Colonel Omer, your legal adviser, in the presence of representatives from the Department of Justice, when we met in Washington, D.C.

FULL-TIME HEADQUARTERS SERVANTS [Bethel Family]

This is a group of 550 men and women situated at the international headquarters of Jehovah's Witnesses in Brooklyn, New York, and at other institutions located at Washington, New Jersey and South Lansing, New York, who are engaged in supervising the work of Jehovah's Witnesses throughout the world by mail, printing of Bibles and Bible literature for use of ministers and missionaries throughout the world and the maintenance of the institutions.  Of this number 224 are of draft age.  *All of these are entitled to exemption under the Act.*

FULL-TIME TRAVELING SUPERVISORS

This group of ministers is composed of the District Servants and the Circuit Servants.  District Servants are traveling representatives having visitorial powers over a district of the United States which includes one or more states or parts of states.  There are 18 districts, each of which is made up of 11 or 12 circuits.  Each circuit is supervised by a traveling minister with supervisory powers to inspect and direct the congregations making up his circuit, numbering from 18–25 congregations.  The average number of congregations in a circuit is 20.  There are 199 Circuit Servants and 18 District Servants, making a total of 217 full-time traveling supervising ministers, of which there are 12 of draft age.  *All of these are entitled to exemption under the Act.*

PIONEERS

Pioneers are full-time ministers of the organization *who devote a minimum annual average of 1200 hours to the field ministry of Jehovah's Witnesses.*  They preach in isolated rural areas of the United States as well as within the urban areas of the country.  These persons, on the basis of the time devoted exclusively to the ministry and the preparations therefor, are entitled to exemption under the Universal Military Training and Service Act, of 1951.

\*　　\*　　\*　　\*　　\*

CONGREGATION SERVANTS

Congregation Servants of the organization are ministers of the organization *whose duties do not require their full time but who devote a substantial part of their time to such duties.*  They have

es 207 and 208 of 186 F.Supp. is accurate. So far as we know, there has never been any secrecy about the form of Jehovah's Witnesses organization; the problem has been one of lack of information. Confusion, we suspect, has been created by the somewhat unusual meaning that has been given by Jehovah's Witnesses to particular words of current use that convey entirely different meanings to persons unacquainted with that sect. The use of words not in current use to describe particular church offices has, we believe, compounded the difficulties.

dedicated their lives to the ministry and perform their supervising duties four or five times weekly. They are placed in the top position of leadership over all of the congregations of Jehovah's Witnesses in the United States and direct and have full charge of the ministerial work of the entire congregation of missionaries and ministers. All of these congregations are composed primarily of non-exempt, part-time missionaries or ministers. They preach under the direction of the Congregation Servant.

\* \* \* \* \*

Watchtower Bible and Tract Society of New York, Inc., the legal governing body of Jehovah's Witnesses, claims that each Congregation Servant who is of draft age is entitled to be exempted under the Act as a leader of the organization; otherwise, if not thus protected, each congregation would be without a presiding minister and top-ranking leader, intended to be protected of the Congress of the United States.

### OTHER SERVANTS

There are other servants who are part-time ministers in each congregation who act as assistants to the presiding minister, known as the Congregation Servant. Like the Congregation Servant, these are leaders in the organization whose lives are dedicated to the ministry. These are known as Assistant Congregation Servant, Bible Study Servant, Theocratic Ministry School Servant, Watchtower Study Servant, Magazine-Territory Servant, Literature Servant and Accounts Servants. These men regularly perform their duties in a supervising capacity over the congregation.

\* \* \* \* \*

Each of such servants *who devotes a substantial amount of his time to the performance of his duties* as such servant, as well as to the door-to-door missionary work of Jehovah's Witnesses, *and who does not perform such duties irregularly,* the Watchtower Bible and Tract Society of New York, Inc., takes the position that he should be entitled to the exemption provided for in the Act, *depending upon the circumstances of each particular case,* as to whether his life is devoted to the ministry as a leader,

*and he pursues it as his vocation, as properly defined in the Act.*

\* \* \* \* \*

### BOOK STUDY CONDUCTORS

These men have important positions of leadership within the organization. They are appointed to supervising positions to preside over small meetings of a part of the congregation each week. This is called a Service Center. The meetings are of a group within a geographical subdivision of the total missionary field of the congregation. These regular meetings of the group are held in a private home in the assigned area, and not at the headquarters of the regular congregation meeting place or church, known as the Kingdom Hall, while the group as such is considered a church in the scriptural sense. These Book Study Conductors have direct supervision over these small groups of people, ranging from approximately 8–20 people, in the performance of the door-to-door ministry in the subdivision of the missionary field assigned to the group. Some men and women fill this job, as well as two or more other servant's positions in some of the congregations. See the table at the end of this letter.

Watchtower Bible and Tract Society of New York, Inc., the legal governing body of Jehovah's Witnesses in the United States, takes the position that each of such Book Study Conductors *who devotes a substantial amount of his time* to preparation for and performance of his duties of leadership of the the group as Book Study Conductor, as well as the door-to-door ministry work of Jehovah's Witnesses, should be entitled to claim the exemption provided for in the Act, *depending upon the circumstances of each particular case,* as to whether his life is devoted to the ministry as a leader *and he pursues it as his vocation as properly defined in the Act.*

\* \* \* \* \*

With kind and high personal regards,
Sincerely,
/s/ Hayden C. Covington
[Emphasis ours. The omissions indicated relate to the particular number of individuals in each particular rank.]

For the further understanding of Jehovah's Witnesses by the courts and by Selective Service Boards, we recommend study of the pamphlet "Preaching and Teaching in Peace and Unity," cited and identified by defendant in Exh. I–MM in this case.[10]

In fact, Boards dealing with problems relating to the official duties of a "Congregation Servant," an "Assistant Congregation Servant," a "Bible Study Servant," a "Magazine-Territory Servant," a "Literature Servant," an "Accounts Servant," a "Watchtower Study Servant," a "Theocratic Ministry School Servant," or a "Book Study Conductor" will find the duties of each spelled out fully in that pamphlet.

That pamphlet also states that printed forms for the use of congregations, pioneers, circuit, and district servants are printed by the Society and all Brothers are enjoined not to print their own forms but to use those the Society prints (page 49). On page 15 of the pamphlet all members are requested to "make a weekly report to their congregation of what they have done in the way of preaching the good news."

And on page 23 it is stated that:

When an individual begins to preach the good news and reports his activity to the congregation, a publisher's record card will be made out for that person. These cards will be divided into two groups, those who have symbolized their dedication by water baptism and those who have not. Each month thereafter his preaching activity will be noted thereon. * * * All publisher's record cards should be kept eight years by the congregation. * * * Every individual should try to be a regular publisher. A regular publisher is one who goes out into the field service and turns in his report every month. * * * When the time comes to select servants or book study conductors, those publishers who are regular and the most mature would be recommended as servants. One who desires to become a pioneer should certainly be a regular publisher before he makes application.

The record cards of all individual Jehovah's Witnesses should therefore be available for examination when questions relating to ministerial exemptions arise before particular Boards. Dickinson, of course, points out that "the local board may * * * subpoena witnesses to testify, and require both registrant and witnesses to produce documents" (346 U.S. at 396, 74 S.Ct. at 157).

Exercise of that power and the production of a particular registrant's record card probably would tend to reduce to a minimum any real factual conflict about how much time and what particular activity a particular Witness had in fact done in furtherance of his religious work.[11] A similar subpoena for the time

10. The pamphlet "Preaching Together in Unity" is cited and relied upon by General Counsel Covington in his 1958 Memorandum (see pages 5 and 24 of the Memorandum). That pamphlet, issued January 1, 1955, is an earlier edition of what is now called "Preaching and Teaching in Peace and Unity," issued January 1, 1960. Except for very minor changes, none of substance, the two pamphlets are identical.

The data set forth by General Counsel Covington in his letter to General Hershey is an accurate summary of the information contained in the pamphlets. See footnote 9.

We probably could take judicial notice of "Preaching Together in Unity" because it appears as an appendix to the Brief for the Respondent in Reply to Petition for Writ of Certiorari in United States v. Wiggins, 359 U.S. 942, 79 S.Ct. 723, 3 L.Ed.2d 676, Supreme Court of the United States, October Term, 1958.

11. United States v. Willard, N.D.Ohio 1962, 211 F.Supp. 643, noted that the I–O registrant claiming IV–D exemption testified that he had spent "eons of time just studying practically, and helping other individuals and visiting people" (211 F. Supp. at 647). On the basis of that and similar testimony Judge Kalbfleisch was required to find that "Willard was vague in his testimony before the Board as to the time he was devoting to ministerial

cards of a particular registrant's secular employer would remove doubts on that score.

The whole point of the matter is that cases of this type turn on the facts of each particular case. The Congress has placed the duty of ascertaining those facts on the Local Boards. Fairness to both the registrant and to the public interest requires that this duty not be lightly regarded because the courts will not hesitate to set aside any classification that is not supported by fact. See Senior Judge Richard M. Duncan's decision in United States v. Burnett, W.D.Mo.1953, 115 F.Supp. 141.

We hold in this case that the I–O classification made by the Board in regard to this defendant is supported by facts and that defendant failed to make a prima facie case for his claimed IV–D exemption. On the facts as we have found them, no verdict other than guilty could be justly rendered. That verdict will therefore be entered.

work, and there is nothing in the record to establish that he spent a substantial amount of time in this capacity" (211 F. Supp. at 653). The Sixth Circuit affirmed. See United States v. Willard, 312 F.2d 605, cert. den. 372 U.S. 960, 83 S.Ct. 1014, 10 L.Ed.2d 13. Production

before the Board of that registrant's Jehovah's Witnesses record card would have permitted the introduction of objective documentary evidence. Judicial review of a board's classification would thereby be made more precise.